COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



§

§

IN THE INTEREST OF:

§

S.A.P., C.M.P., AND J.L.P.,

§

MINOR CHILDREN.

§

§

§

No. 08-14-00312-CV

Appeal from

143rd District Court

of Reeves County, Texas

(TC # 13-04-20350-CVR)

## **O P I N I O N**

This is an appeal from an order terminating the parent-child relationships between the mother and father of three young boys. The paternal grandmother, who had been named a joint managing conservator of the children, was removed from her role. The Department of Protective and Family Services was appointed managing conservator. Mother did not appear at trial and has not filed notice of appeal. Thus, we consider only Father's appeal.

### FACTUAL SUMMARY

This is a story of mental illness and family violence. The children lived with their father and paternal grandparents beginning October 11, 2007. In April 2013, allegations arose concerning physical and sexual abuse of the boys by Grandfather and neglectful supervision by Grandmother. At the time, the boys were ages twelve, eight and six. So much past history existed with this family that it was described in the affidavit as a "staggering amount." A formal

forensic interview of the children was conducted by the Children's Advocacy Center. According to Susan Carrasco, an investigator with Child Protective Services, the oldest child made an outcry that his grandfather often threatened them with a knife "in order to get them to be quiet or to not -- threaten them not to say -- not to talk about what was happening at home, not to tell CPS . . . that [Grandfather] would often masturbate or fondle himself." The boy also made outcries of physical abuse and had some bruising to his knees. The middle child made the same outcry concerning use of a knife to threaten the children to keep them quiet about domestic violence in the home. The child was able to describe the knife and identify its location. He explained that his grandfather was abusive to his grandmother and that he would threaten her. There was also violence between the children's father and grandfather. Carrasco spoke with Grandmother who essentially blamed the oldest child, saying that he had been acting out, had been defiant and needed medication adjustments for his behavior.

Carrasco described other incident reports. In 2009, another grandchild was removed from the home because of complaints that Grandfather held a knife to him. Father is a paranoid schizophrenic and has a criminal history dating back to 1995. Most concerning to the Department were two terroristic threats he made against family and household members in 2009 and 2010. He had also been charged with family violence assault.

Based on the outcries and the previous events, the Department filed to remove the children. On April 18, 2013, a safety plan was effectuated stipulating that Grandfather could no longer reside in the home. But due to Grandmother's inability to be protective, Father's mental health history, and the history of domestic violence in the home, the Department sought

temporary managing conservatorship within weeks.

An adversary hearing was held May 2, 2013 and the Department was awarded temporary managing conservatorship. Mother, Father and Grandmother were ordered to complete services, including psychological evaluations, MHMR evaluations, parenting classes, counseling, and random drug testing with the ultimate goal of family reunification. The boys were initially placed at an emergency shelter in Abilene and later in a foster home in Dublin, Texas.

Lee West is a licensed professional counselor who provided family counseling for the boys and Grandmother. He also conducted eight counseling sessions with Father, working on anger management issues, impulse control issues, and his relationship with the children. Father showed a genuine love for the boys but he had some medication issues and difficulty with impulse control. Father discussed his own father, advising that Grandfather was not allowed to be with the children or to talk with them because of the abuse allegations. West offered his professional opinion that he had concerns about whether the boys would be safe living in the home with their father. With regard to Grandmother, West conducted nine individual sessions plus a session with the children. They talked about family violence, the children's safety, and how to deal with Father's anger issues. He believed Grandmother had a genuine love for the boys, but she was unable to understand their concerns:

> I think, during the family sessions, she had difficulty understanding the boys. That they did not really want to go back to the home. That they feared going back to the home. And when the boys tried to express that in the family meeting, she had difficulty hearing them and accepting what they were saying.
>
> Q. If they did go home, do you think that she could take -- keep them safe from their grandfather and their father, keep them safe?

A. I think she would try. I have concerns that -- would she be able to? It's my understanding that she -- let's see how to word this. She has the best concerns for the children, but being able to protect the children from anger from her son, from the impulses, I guess I have concerns since he's still in the hospital, but he still hasn't fully accomplished the goals there. As far as the grandfather, she has difficulty seeing the danger that the grandfather would present since he was circling the office where we had the family meeting. It seemed like the grandfather doesn't stop, basically. I think she is very well intentioned. I just have concerns with these two individuals not coming to the home.

Q. Did she tell you anything specifically about the dangers that [Father] presents to the children?

A. Let me see.

Q. I think you mentioned threats before. Could you clarify what the threats were?

A. All right. Let me see if I can find those. While she was in the individual session, she talked about [Father] assaulting her, and she had concerns that this might occur possibly in the future.

Q. Regarding the combined family session between [Grandmother] and the boys, was it your understanding that -- what was your understanding of the purpose of that session?

A. Just to get the boys to express their emotions to [Grandmother], for them to get their feelings as to how they would feel about coming back to live in the home. They had -- they tried to express to her that they were still fearful of the grandfather, and that they didn't feel that the grandfather would stay away. Also, that they felt that they weren't being heard. The boys, when they tried to express their feelings, they sort of gave up, and one of them put their head down, and I think she expressed that, you know, he was tired, but they were just sort of resigned that nothing's changed, and that they wouldn't be safe there.

When asked whether Grandmother had a realistic grasp of what it would take to protect the boys, West responded that she has been in many violent situations in her life and she goes into a "protective mode". He had concerns that if Father or Grandfather came to the home, her ability to protect the boys from either one of them would be impaired. Grandmother also lacked a

realistic grasp of the emotional needs of the children. She tended to change the subject when they spoke of their feelings. All three children indicated to West that they wanted to remain in the foster home because they felt safe there. West believed it would be in their best interest to stay because it would be the safest place for them. West then addressed the relationship between Grandmother and Grandfather. Grandmother did not believe that her husband had abused the boys and when a child is not believed, he feels unsafe.

Grandmother testified that on April 22, 2013, all of the boys came into her bedroom and told her that Father had threatened them and told them what to tell the police and the CPS worker about their Grandfather's threats and masturbation. Grandmother reported to the police investigator that what the children had said was untrue. She had never seen Grandfather threaten the children with a weapon although Father had done so. She never kicked him out of the house because he threatened the entire family. She had observed violence between Father and Grandfather, but Father always started it. They fought each other with knives. Father would verbally abuse both of his parents. He would "parade around naked and do masturbation and sexual gestures to the kids." Father was eventually arrested for trying "to do away" with Grandmother. He turned the gas on and had been making threats to burn the house down. He made threats of murder and arson in front of his children and Grandmother was afraid that he would really do it. But her method of dealing with the situation was, "I'd say, 'Don't listen to him. Let's just sit down and read a book,' or read out loud or watch cartoons, anything to get their minds off of it or we'll kneel down and say our prayers."

Grandmother testified that if the boys could come home to her on the condition that they

never have any contact with Father or Grandfather, she could make that happen, "but it's not fair for my husband to be caught in the middle of it." If it was required, however, she would make arrangements for her husband to live elsewhere for the next twelve years.

Father is a paranoid schizophrenic and has been declared legally incompetent. At the time of trial, he was an inmate at the Big Spring State Hospital. When called as a witness, he invoked his Fifth Amendment rights and did not testify. Grandmother did discuss the mental illness in the family.

Q: And what are the boys' disabilities?

A. Fetal alcohol syndrome, ADHD, PTSD, autism. Those are the most important neurological disorders.

Q. You realize that since they've been in foster care, they've been re-evaluated, and several of those things have been ruled out now, do you know that?

A: The oldest one has told me that. Back when the foster mother brought the children to have a family counseling, the oldest one did inform me that he was getting back on medication, and that his psychiatrist had designated him as being a schizophrenic, just like his father, and then the two youngest ones, they still had shown mood disorders, the ADHD, and the autism.

Grandmother also believed that the children had been abused at the foster home. She described the youngest as being "emotionally wrecked by being grounded for months, not just one day or one hour, by months, and being excluded in going anywhere with his other brothers."

Jody Williamson is a CASA volunteer and served as the boys' guardian ad litem. She recommended that the children remain in the foster home. She based her opinion on the fact that the children had "not faltered or waived (sic) anything that they have said to me" about the allegations of abuse in the home.

A. They want safety is their main issue. Love. They want to grow up in a home that doesn't have violence.

Q. Do they want to remain with the foster parents?

A. Yes, they do.

Q. Is your recommendation partially based on observations that you've made of the children and things that they've done?

A. Yes.

Q. Was there a specific incident that particularly stands out in your mind?

A: I and Mary Bell, my executive director at that time, went to Harmony Home to visit the boys. We were just asking how they were, sorry, and [S.A.P.] said, "Here. Let me show you what happened."

Q. Do you need to take a minute?

A. And that little boy got with [C.M.P.] and they showed us -- we didn't ask them to do this. They just did it. [S.A.P.] played the grandfather, and [C.M.P.] played [S.A.P.]. So S.A.P. put his hand on [C.M.P.]'s shoulder and took a knife, or his finger, and said "This is a knife," and they described the knife, and they -- he went like this to his brother.

Q. For the record, dragged his finger across his brother's throat?

A. Yes. And he said that's what's going to happen to you. He said they would come home from the school, and they had a Teddy Bear that had his throat cut and his head cut off and the stuffing out of it, and the grandfather had done it.

Williamson also explained that the boys have voiced their unwillingness to return to their grandmother because they are afraid of their grandfather. The children recounted that they believe Grandmother would allow Grandfather back in the house because "he overpowers her. That he – she does whatever he says." They don't believe Grandfather will stay away and that makes them "very fearful."

- 7 -

Finally, Williams discussed the progress they children have made in foster care. The oldest is more talkative and easier to understand. He is calm and becoming more self-assured. He is gaining self-confidence. The younger boys are excelling in their school work and are better socially. "They're just doing so much better in every aspect."

J.W. has been the boys' foster mother since August 2013. She also described the positive changes in the children. S.A.P. is playing football and is one of the best on the team. He is an A and B student. He is no longer on medication and is not receiving services. He had low self-esteem in the beginning but is improving. C.M.P. is in special education reading and math classes and is also an A and B student. He is no longer ADHD but he tested below the mental status and is receiving services. The youngest still struggles and is a bit stubborn and hardheaded with the teachers. He is treated for ADD with medication. J.W. asked the court to terminate the parental rights of both parents so that she and her husband could adopt the boys.

Kendrick Ragland is a conservatorship worker for the Department. He testified that Mother did not complete any of the ordered services. Father and Grandmother did complete their service plans and both regularly took advantage of opportunities to call the boys. Because of this, the Department considered a "monitored return" of the children. The first step was a family session with Lee West. Father didn't attend because he was arrested on May 7, 2014 for making terroristic threats and interfering with an emergency contact call. Because of his incarceration, he was not able to attend the counseling session and the Department abandoned efforts to reunite the children with him. It was still considering a monitored return to Grandmother. That changed after the family session:

- 8 -

Q. Okay. After the family session, did our plan change again?

A. Yes; it did.

Q. And what did it change to?

A. Termination of parental rights and also termination of JMC for the grandmother.

Q. And just briefly, we've already heard from Mr. West, but just briefly, what caused that shift?

A. [Grandmother] basically told the boys that they had been brainwashed and that they were lying on grandpa. She was very defiant and did not let them get a word in otherwise. In addition, the children spotted [Grandfather] several times before and after the family session riding around the building.

The Department had approached Mother, but she claimed she could not care for the boys because she was taking care of her five-year-old daughter. She had not made contact with the boys in over a year and had made no effort to begin her service plan, much less complete it. The Department sought termination of her rights based on constructive abandonment and failure to comply with the service plan. It sought to terminate Father on grounds of endangerment and to remove Grandmother as a joint managing conservator. He explained the reasoning:

Q. Okay. And at this time are we asking the Court to remove her as a conservator?

A. Yes.

Q. Can you tell us why that would be in the boys' best interest?

A. [Grandmother] has failed to protect her grandchildren from physical, emotional, and sexual abuse. She still is in denial even after completing services ordered by the Department that her husband committed such acts, and told her grandchildren that they were lying on her husband.

Q. It has been suggested a couple of times today in a roundabout sort of way that the Department could return the children to her and continue monitoring. Is that

an option at this point?

A. No.

Q. Why not?

A. Because she hasn't proven to the Department that she has protective capacities to care for these children.

Q. So even if we sent a case worker by every day, we don't feel like they would be safe with her?

A. No.

Ragland recounted that S.A.P. had mentioned "he used to think that the environment that he was -- he was in back in Pecos was normal." The boy said living with the foster parents is much more peaceful. He wants to stay there. In fact, each of the boys expressed a preference for remaining with their foster family. As to best interest, Ragland testified:

Q: Are either of the parents or the grandmother able to provide for these boys' long-term emotional needs?

A. No.

Q. Are any of them -- have any of them demonstrated the ability to provide for their -- for the boys' long-term safety?

A. No.

Q. Have any of them demonstrated appropriate parenting skills?

A. No.

Q. Have any of them given the Department a legitimate reason for their failure to protect and their failure to provide parenting?

A. No.

Q. Is the Department looking at the foster parents as a long-term placement even

if adoption doesn't work out?

A. Yes.

Q. And are the foster parents, have they demonstrated that they are more than capable of providing safety and support and stability and everything these kids need?

A. Yes.

Lastly, the children's attorney ad litem offered her report. The children have told her they want to remain with their foster family. They're afraid of their grandfather and don't believe their grandmother can keep them safe. There has been domestic violence within the home between Grandmother and Grandfather and between Father and both of his parents. Father is institutionalized. The boys told vivid stories of knives and mutilated teddy bears. Their stories have been consistent -- they long to feel safe.

## PARENTAL TERMINATION

A parent's rights may be involuntarily terminated through proceedings brought under Section 161.001 of the Texas Family Code. *See* TEX.FAM.CODE ANN. § 161.001 (West 2008). Under this provision, the petitioner must (1) establish one or more of the statutory acts or omissions enumerated as grounds for termination, and (2) prove that termination is in the best interest of the child. *See id.* Both elements must be established and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Texas Department of Human Services v. Boyd,* 727 S.W.2d 531, 533 (Tex. 1987).

The natural right of a parent to the care, custody, and control of their children is one of constitutional magnitude. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985); *see also Santosky v.*

*Kramer,* 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982) (acknowledging that a parent's rights to "the companionship, care, custody, and management" of their children are constitutional interests, "far more precious than any property right").  Not only is a parent's interest in maintaining custody of and raising her children "paramount;" it is quite possibly the oldest fundamental liberty recognized by our courts.  *See In the Interest of M.S., E.S., D.S., S.S., and N.S.,* 115 S.W.3d 534, 547 (Tex. 2003) (noting that Texas courts recognize that "a parent's interest in maintaining custody of and raising his or her child is paramount"); *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000) (in discussing the constitutional stature of parental rights, the United State Supreme Court said, "the interest of parents in the care, custody, and control of their children -- is perhaps the oldest of the fundamental liberty interests recognized by this Court"); *see also In re M.S.,* 115 S.W.3d at 549 ("Termination of parental rights is traumatic, permanent, and irrevocable.").  Although parental rights are of constitutional magnitude, they are not absolute.  *In the Interest of C.H.,* 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

### *Burden of Proof*

Because of the importance of parental rights, and the severity and permanency of termination, the quantum of proof required in a termination proceeding is elevated from a preponderance of the evidence to clear and convincing evidence.  *Santosky,* 455 U.S. at 747, 102 S.Ct. at 1391; *accord Holick,* 685 S.W.2d at 20-21; s*ee In re M.S.,* 115 S.W.3d at 547 and *In the*

*Interest of D.S.P. and H.R.P.,* 210 S.W.3d 776, 778 (Tex.App.--Corpus Christi 2006, no pet.) (cases recognizing that involuntary termination of parental rights is a drastic remedy which divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent.); *see also In the Interest of B.L.D. and B.R.D.,* 113 S.W.3d 340, 353–54 (Tex. 2003) (noting that because of the severity and permanency of termination, due process requires the party seeking to terminate parental rights prove the necessary elements by the heightened burden of proof of clear and convincing evidence).

"Clear and convincing evidence" means the measure or degree of proof that "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007 (West 2008); *see In the Interest of J.F.C.,* 96 S.W.3d 256, 263 (Tex. 2002); *see also In the Interest of J.A.J.,* 243 S.W.3d 611, 616 (Tex. 2007) (contrasting the standards applied in termination proceedings and the standards applied in modification proceedings); *In the Interest of C.D. and K.D.,* No. 02-10-00070-CV, 2011 WL 1743688, at *4 (Tex.App.--Fort Worth May 5, 2011, no pet.). This intermediate standard falls between the preponderance of evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *State v. Addington,* 588 S.W.2d 569, 570 (Tex. 1979); *In the Interest of D.T.,* 34 S.W.3d 625, 630 (Tex.App.--Fort Worth 2000, pet. denied) (op. on reh'g). Although the proof must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *Addington,* 588 S.W.2d at 570.

## Standards of Review

The Supreme Court has clearly articulated the applicable standards of legal sufficiency review in termination cases. Accordingly, we consider all of the evidence in the light most favorable to the trial court's finding, "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In the Interest of J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005), *quoting In re J.F.C.,* 96 S.W.3d at 266. We give deference to the fact finder's conclusions, indulge every reasonable inference from the evidence in favor of that finding, and presume the fact finder resolved any disputed facts in favor of its findings, so long as a reasonable fact finder could do so. *Id.; In re J.F.C.,* 96 S.W.3d at 266. We disregard any evidence that a reasonable fact finder could have disbelieved, or found to have been incredible, but we do not disregard undisputed facts. *In re J.P.B.,* 180 S.W.3d at 573; *In re J.F.C.,* 96 S.W.3d at 266. A legal sufficiency or no evidence point will only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *See Swinney v. Mosher,* 830 S.W.2d 187, 194 (Tex.App.--Fort Worth 1992, writ denied).

## The Termination Order

### Mother's Rights

Mother's rights were terminated under TEX.FAM.CODE ANN**.** § 161.001(N), with the court finding that she had (1) constructively abandoned the children who have been in a

permanent or temporary managing conservatorship with the Department of Family and Protective Services or authorized agency for not less than six months, and the Department or authorized agency has made reasonable efforts to return the child to the parent; (2) failed to regularly visit or maintain significant contact with the children; and (3) demonstrated an inability to provide the children with a safe environment. The court also found that termination was proper under TEX.FAM.CODE ANN. § 161.001(O) because Mother failed to comply with the provisions of the court order that specifically established the actions necessary for her to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child. Lastly, the court found that termination was in the best interest of the boys.

## Father's Rights

Father's rights were terminated under TEX.FAM.CODE ANN. § 161.001(D) and (E), with the trial court finding that he knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children; and that he engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children. The court also found that termination was in the best interest of the boys.

## Grandmother

The trial court removed Grandmother as joint managing conservator of the children.

### Statutory Predicates

Both subsections (D) and (E) require proof of endangerment, which means to expose to loss or injury, or to jeopardize a child's emotional or physical health. *Doyle v. Texas Department of Protective and Regulatory Services,* 16 S.W.3d 390, 394 (Tex.App.--El Paso 2000, pet. denied). While endangerment means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffer injury. *Doyle,* 16 S.W.3d at 394. Subsections (D) and (E) differ in one respect: the source of the physical or emotional endangerment to the child. *See In Interest of B.S.T.,* 977 S.W.2d 481, 484 (Tex.App.--Houston [14th Dist.] 1998, no pet.); *In Interest of S.H.A.,* 728 S.W.2d 73, 83-84 (Tex.App.--Dallas 1987, writ ref'd n.r.e.). Subsection (D) requires a showing that the environment in which the child is placed endangered the child's physical or emotional health. *Doyle,* 16 S.W.3d at 394. Conduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under Subsection D. *Id.; see In re W.S.,* 899 S.W.2d 772, 776 (Tex.App.--Fort Worth 1995, no writ) ("environment" refers to the acceptability of living conditions, as well as a parent's conduct in the home). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under subsection (D). *In re M.R.J.M.,* 280 S.W.3d 494, 502 (Tex.App.--Fort Worth 2009, no pet.). The fact finder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *Id.*

Thus, subsection (D) addresses the child's surroundings and environment rather than parental misconduct, which is the subject of subsection (E). *Doyle,* 16 S.W.3d at 394; *B.S.T.,* 977 S.W.2d at 484; *S.H.A.,* 728 S.W.2d at 84.

Under subsection (E), the cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's actions but also by the parent's omission or failure to act. *Doyle,* 16 S.W.3d at 395; *B.S.T.,* 977 S.W.2d at 484; *S.H.A.,* 728 S.W.2d at 83-84. The conduct to be examined includes what the parents did both before and after the child was born. *In Interest of D.M.,* 58 S.W.3d 801, 812 (Tex.App.--Fort Worth 2001, no pet.); *Dupree,* 907 S.W.2d at 84. To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct. *Dupree,* 907 S.W.2d at 84; *In Interest of C.D.,* 664 S.W.2d 851, 853 (Tex.App.--Fort Worth 1984, no writ). Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In Interest of K.M.M.,* 993 S.W.2d 225, 228 (Tex.App.--Eastland 1999, no pet.). The specific danger to the child's well-being need not be established as an independent proposition, but may be inferred from parental misconduct. *In Interest of N.K.,* 99 S.W.3d 295, 300 (Tex.App.--Texarkana 2003, no pet.). Evidence of criminal conduct, convictions, and imprisonment and its effect on a parent's life and ability to parent may establish an endangering course of conduct. *In re J.T.G.,* 121 S.W.3d at 133. Imprisonment alone does not constitute an endangering course of conduct but it is a fact properly considered on the endangerment issue. *Boyd,* 727 S.W.2d at 533-34; *In re R.W.,* 129 S.W.3d at 743-44. Routinely subjecting a child to the probability that she will be left alone

- 17 -

because her parent is in jail, endangers the child's physical and emotional well-being. *See In the Interest of S.D.,* 980 S.W.2d 758, 763 (Tex.App.--San Antonio 1998, pet. denied). However, "the relationship of the parent and child, as well as efforts to improve or enhance parenting skills, are relevant in determining whether a parent's conduct results in 'endangerment' under section 161.001(1)(E), even where the parent is incarcerated." *In the Interest of D.T.,* 34 S.W.3d 625, 640 (Tex.App.--Fort Worth 2000, pet. denied). Finally, under subsection O, the Department has the burden to establish that (1) the parent was ordered to comply with a family service plan as a result of the child's removal for abuse or neglect, and (2) she failed to comply with the requirements of the family service plan.

### Best Interest of the Children

A determination of best interest necessitates a focus on the child, not the parent. *See In the Interest of R.F.,* 115 S.W.3d 804, 812 (Tex.App.--Dallas 2003, no pet.). However, there is a strong presumption that it is in the child's best interest to preserve the parent-child relationship. *Swate v. Swate,* 72 S.W.3d 763, 767 (Tex.App.--Waco 2002, pet denied). The Texas Supreme Court has enumerated certain factors which should be considered: the child's desires; the child's emotional and physical needs now and in the future; the emotional and physical danger to the child now and in the future; the parenting abilities of the individuals seeking custody; the programs available to assist those individuals to promote the child's best interest; the plans for the child by those individuals or the agency seeking custody; the stability of the home or proposed placement; the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and any excuse for the parent's acts or omissions. *Holley*

*v. Adams,* 544 S.W.2d 367, 372 (Tex. 1976) ("the *Holley* factors"). Also, permanence is of paramount importance in considering a child's present and future needs. *Dupree v. Texas Department of Protective & Regulatory Services,* 907 S.W.2d 81, 87 (Tex.App.--Dallas 1995, no pet.).

### WAS TERMINATION IN THE BEST INTEREST OF THE CHILDREN?

In his brief, Father acknowledges that the statutory predicates under subsections (D) and (E) have been met. He brings two issues for review challenging only the legal and factual sufficiency of the evidence to support the trial court's finding that termination was in the best interest of the boys. The crux of his argument is that the Department presented little evidence of Father's ability to parent once he is released from the State Hospital and presented no evidence that the children were afraid of Father. In short, Father complains that the danger to the children is their grandfather. We dispute his interpretation of the record.

There is abundant evidence regarding the behavior of the grandfather. But there is likewise vivid testimony of Father's issues. We will highlight the specific testimony with regard to him. Grandmother testified that on April 22, 2013, all of the boys came into her bedroom and told her that **Father** had threatened them and told them what to tell the police and the CPS worker about their Grandfather's threats and masturbation. Grandmother reported to the police investigator that what the children had said was untrue. She had never seen Grandfather threaten the children with a weapon although **Father** had done so. She never kicked him out of the house because **he** threatened the entire family. She had observed **violence between Father and Grandfather, but Father always started it. They** fought each other with knives. **Father**

- 19 -

would verbally abuse both of his parents. **Father** would "parade around naked and do masturbation and sexual gestures to the kids." **Father** was eventually arrested for trying "to do away" with Grandmother. **He** turned the gas on and had been making threats to burn the house down. **He** made threats of murder and arson in front of his children and Grandmother was afraid that he would really do it.

Father refused to testify based on his constitutional Fifth Amendment right. When a litigant chooses to invoke his right in civil matters, certain inferences may be drawn. *Cook v. Tom Brown Ministries* 385 S.W.3d 592, 602 (Tex.App.--El Paso 2012, pet. denied), *citing Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976); *Wil-Roye Inv. Co. II v. Washington Mut. Bank, FA,* 142 S.W.3d 393, 405 (Tex.App.--El Paso 2004, no pet.); *Tex. Cap. Securities, Inc. v. Sandefer,* 58 S.W.3d 760, 779 (Tex.App.--Houston [1st Dist.] 2001, pet. denied). This rule has been applied in suits for parental termination. *See In re C.J.F.,* 134 S.W.3d 343, 352–53 (Tex.App.--Amarillo 2003, pet. denied) ("Refusal to answer questions by asserting the privilege is relevant evidence from which the finder of fact in a civil action may draw whatever inference is reasonable under the circumstances"), *citing In re P.A.O., M.P.O., and S.L.O., Minor Children*, No. 08-98-00436-CV, 2001 WL 175620 at *13 (Tex.App.--El Paso February 22, 2001, pet. denied) (not designated for publication).

Father did not testify as to his plans following his release from the State Hospital. Prior to his incarceration, he had been living with his parents and the children. It is a reasonable inference that, having nowhere else to go, he would return home. It is also a reasonable inference that because Grandmother either could not or would not prevent Grandfather from

living at the home, the domestic violence between the men would resume.

The counselor also expressed his concerns about whether the boys would be safe living with Father. He opined that if Father or the grandfather came to the home, Grandmother's ability to protect the boys from either of them would be impaired. He added that Father's impulse control problems were affected by issues with his medication. The counselor did not know whether Father would ever fully recover but he certainly could not currently function as a parent. In individual sessions, Grandmother spoke of Father assaulting her and she had concerns that this might occur in the future.

This evidence demonstrates compliance with the *Holley* factors. The children were afraid to return home and wanted to remain with their foster family. It is true that they did not specifically say they did not want to live with Father. But they articulated their fear for their physical safety, and their emotional states of mind focused on their distrust of Grandmother to protect them. The violence and emotional abuse in the household presents danger to the children, both now and in the future. With regard to parenting ability, Grandmother and Father are clearly lacking judgment. Programs were made available, but Grandmother believed the children were lying and Father offered no evidence of progress or recovery. Plans for the future were offered by Grandmother and amounted to a return to previous conditions. The home environment was unstable, while the children were thriving in their foster home and wanted to remain. The record is replete with Father's acts and omissions which indicate that the existing parent-child relationship is not a proper one. Using *Holley* terminology, his excuse is mental illness. We applaud his efforts at getting treatment, but he faces criminal charges still. Given the

counselor's concern that Father's impulse control is related to issues with his medication, we have little confidence that his behavior will change.  Most importantly, Father had the opportunity to testify concerning his medication, psychiatric treatment, progress, goals, and plans for his children.  He exercised his right not to do so.  He cannot now sit back and complain that the Department provided little evidence of medical treatment or the severity of his paranoid schizophrenia.

Because the Department proved by clear and convincing evidence, both legal and factual, that termination was in the best interest of the children, we overrule Issues One and Two and affirm the judgment of the trial court below.

February 13, 2015

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.