**Opinion issued December 14, 2017**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-17-00471-CV

———————————

## IN THE INTEREST OF L.D., A CHILD

---

### On Appeal from the 315th District Court
### Harris County, Texas
### Trial Court Case No. 2016-03613J

---

### MEMORANDUM OPINION

These appeals arise from a decree terminating the parental rights of both a mother and a father to their biological child, L.D. Both parents contend that the evidence was insufficient to support the trial court's decree. The father additionally asserts that the evidence was insufficient to support the appointment of the

Department of Family and Protective Services, rather than the child's paternal grandmother, as L.D.'s sole managing conservator.

Because the evidence is sufficient to support termination of parental rights of both parents, as well as the court's appointment of the Department as L.D.'s managing conservator, we affirm.

**Background**

At the age of six months, L.D. was removed from the care of his mother after the Department of Family and Protective Services received two separate referrals alleging neglectful supervision. First, the Department received a call reporting that the mother was a "severe alcoholic," she smoked what was presumed to be marijuana in the home, she used Xanax, and L.D.'s father had found a "meth pipe" in the mother's laundry. It was further alleged that the mother would get drunk and pass out, leaving L.D. in the care of his eight-year-old sister. In a second report, it was alleged that the mother had a history of driving while intoxicated, and L.D. was in the vehicle when she was arrested for driving while intoxicated. Upon L.D.'s removal from his mother's care, he was placed under the temporary conservatorship of the Department.

The Department created separate family service plans for the father and the mother, both of which the trial court incorporated by reference in a status hearing

2

order, making the service plans orders of the court. Caseworker Jefre Stubbs was listed as the Department's contact person on both plans.

Both service plans laid out the details of the neglectful-supervision allegations as the reason for the Department's involvement, and each set out numerous individually-tailored tasks and services to be completed by the parents before unification with L.D. could occur. Each plan set out instructions for how and when the parent should report or provide proof of completion of or participation in each task or service. Each plan stated that its purpose was to help the parent provide a safe environment for the child within the specified time, and that if the parent was unwilling or unable to provide his or her child with a safe environment, his or her parental and custodial duties may be restricted or terminated, or the child may not be returned to the parent.

The case was tried to the bench. Although attorneys appeared on each parent's behalf, neither the mother nor the father personally appeared at trial. L.D.'s attorney ad litem also appeared at trial.

The Department called the assigned caseworker, Jefre Stubbs, to testify at the trial. She testified that that L.D. had been placed under the Department's care after the mother was charged with driving while intoxicated when he was in the vehicle. She stated that L.D. had been in a foster home for the past year.

3

The caseworker testified that the mother had started her family service plan, but she failed to complete several tasks, including establishing stable housing and income, and refraining from illegal activity. The mother completed a drug-treatment program, but the family service plan also required the mother to "obtain a 12-step sponsor" and "attend at least three meetings per week." The caseworker testified, "Mom started at the beginning of the case with AA," but "then she stopped" due to "her confusion between her substance abuse assessment recommendations" and other recommendations she received from the Department. After the Department clarified that "AA" would need to be completed throughout the case, the mother said she would restart the program, but she never did.

Throughout the case, the mother submitted to random drug and alcohol testing. She initially tested positive for marijuana and alcohol. While a later test was negative, the mother again tested positive for alcohol five months after L.D.'s removal. The caseworker added that the mother's other drug tests were negative, although one test was missed nine months after L.D.'s removal due to a claimed transportation issue.

The caseworker also explained that the mother visited L.D. consistently throughout the beginning of the suit, but later she missed three or four visits, and had last visited L.D. approximately three weeks before trial. The caseworker had observed the visits and noted that the mother's behavior was "appropriate." She

4

stated that the mother had attended all court hearings except the final permanency hearing held a week before trial. She further testified that police had removed the mother from a home nine days before trial because she was drunk and passed out. The police could not incarcerate the mother because she was too intoxicated. As of the date of trial, the mother was homeless.

The caseworker spoke with an investigator who informed her that criminal charges were being brought against the mother, and one of her other children was to be removed. The caseworker believed returning the children to their mother would endanger them due to her alcohol abuse. She did not believe the mother could provide minimum standards such as food, clothing, and a safe home for L.D. because she did not have stable housing and income.

In the two weeks prior to trial, the mother named her stepfather, who lived in North Dakota, as someone who could support her. The caseworker said that an assessment would need to be completed before the Department could determine whether that placement would be viable.

With respect to the father, the caseworker explained that the father had an "extensive criminal history including assault of family members and various drug offenses." He had completed much of his family service plan, including parenting classes, a psychosocial evaluation and therapy, and a DNA test. However, he did not complete domestic-violence classes, nor did he demonstrate stable housing or

income. The father had failed to maintain communication with the caseworker for three months prior to trial. Although the father had tested positive for methamphetamine on one test, he otherwise remained sober throughout the case. The father also had visited L.D. extensively until three months before trial, but he did not visit after that, claiming he had legal issues that prevented him from doing so. He had attended all court hearings until three months before trial.

The caseworker had seen the father the week before trial, and he was living with his mother. She stated that she had informed him of the next court date, but he told her he would not go to court to fight for his son. In addition to proclaiming that he had other legal issues to resolve, he would not be appearing at the next court date because the case was "not his fault," but instead was a result of the mother and her sister "calling CPS on each other." He said his legal issues included past-due child support and a violation of probation which stemmed from charges of evading arrest and assault on a family member. The caseworker testified that he had to pay $1,000 to resolve the child-support issue, but she was unsure if he had resolved the probation issue.

The caseworker further testified that although the current foster family did not want to adopt L.D., the Department had identified an adoptive placement and the child's visits with the potential adoptive family had gone "great." She explained that L.D. had already bonded with another child at the adoptive placement, and his

sibling, who is also the biological child of the mother, was being moved to the same adoptive placement that day.

The caseworker also discussed the Department's decision not to place L.D. with his paternal grandmother, C.D. She testified that the grandmother had been rejected as a potential placement because of her history of criminal offenses and an allegation of child abuse in her home.

The child's paternal grandmother also testified at the trial. She stated that she was seeking placement of L.D., and that she decided to appear in the case after being informed that the child might be adopted out of the family. She indicated that she had not become involved in the case earlier because the mother and father were completing the family service plans, and she believed they would regain custody of L.D. She testified that she had not seen L.D. since the mother's arrest prior to the child's removal. She admitted that she had a misdemeanor criminal history, including a driving while intoxicated conviction from five years earlier, but she had completed all of the requirements to get her license back. She asked the court to place L.D. in her care.

The trial court found that the mother and the father each had committed the predicate acts of endangerment (under subsections D and E), constructive abandonment (under subsection N), and failure to comply with a court order (under subsection O). It also found that termination of both the mother's and the father's

7

parental rights was in L.D.'s best interest. Based upon those findings, the trial court terminated the parental rights of both parents. The Department was named sole managing conservator of the child.

Both parents appealed.

## Analysis

### I.     Termination of parental rights

To terminate parental rights, the State must establish by clear and convincing evidence that there is at least one statutory ground for termination and the termination is in the child's best interest. TEX. FAM. CODE § 161.001(b). In reviewing the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the trial court's finding to decide "whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true."[1] We assume

---

[1]     *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). The mother's brief argues that a "de novo review" is required. The Department responds that this argument is inadequately briefed, *see* TEX. R. APP. P. 38.1(i), and we agree. The issue is not resolved merely by acknowledging the importance of the rights at issue, which is the entire substance of the mother's argument. The mother does not offer any substantive legal argument to answer the open, and hardly self-answering, question identified in *J.F.C.* of whether, in appellate review of parental-termination decrees, "the United States Constitution requires the type of review set forth by the United States Supreme Court" in defamation cases and for punitive damage awards, and if so, whether the standards of review applied in *J.F.C.* "would comport with the *de novo* review required by those decisions." *J.F.C.*, 96 S.W.3d 256 at 268 & nn. 42–43 (citing *Harte–Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 685–86, 109 S. Ct. 2678 (1989), *Bose Corp. v. Consumers Union*, 466 U.S. 485, 515–16, 104 S. Ct.

that any disputed facts were resolved in favor of the finding as long as a reasonable factfinder could have done so. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). To assess the factual sufficiency of the evidence, we consider all evidence that the factfinder reasonably could have found to be clear and convincing, and ask "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). Our review is limited to evidence actually presented or admitted at trial, as well as any matters of which the court could have taken judicial notice. *See, e.g.*, *In re J.E.H.*, 384 S.W.3d 864, 869–70 (Tex. App.—San Antonio 2012, no pet.).

---

1949 (1984), and *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 436, 121 S. Ct. 1678 (2001)). As one aspect of the complexity of the legal analysis for Texas state courts, *J.F.C.*'s pinpoint citations to *Bose* identify a discussion of the standard of review in then-Justice Rehnquist's dissenting opinion. *See id.* at 268 nn. 42 & 45 (citing *Bose*, 466 U.S. at 515–16). In any case, even if we were to conclude that "de novo review" is required, the mother's brief does not address the second part of the question identified in *J.F.C.*: whether the standards currently applied in Texas satisfy the requirement of "de novo review" in a context that involves application of law to factual determinations made in the trial court. The mother offers no argument that a de novo review would result differently than the application of the ordinary standard of review routinely applied by Texas courts in termination appeals.

### A.    Predicate findings of endangerment

Both the mother and the father challenge the legal and factual sufficiency of several of the predicate findings to support termination. Only one predicate finding under Section 161.001(b)(1) is required to support a judgment of termination when there is also a finding that termination is in the best interest of the child. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Typically, if any predicate finding is conceded or unchallenged, it is not necessary to review the legal or factual sufficiency of the evidence as to any other predicate grounds. *See id.*; *see also In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The mother concedes that the evidence was sufficient to support the trial court's finding under subsection O. The father's brief does not challenge the finding under subsection N, and thus it also concedes this finding. *L.M.*, 104 S.W.3d at 647.

The mother's brief argues that unchallenged predicate findings can be used to support a finding that termination is in the best interest of the child, and they also can have collateral consequences in subsequent termination proceedings involving other children. *See* TEX. FAM. CODE § 161.001(b)(1)(M) (predicate termination ground applicable to a parent who has "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state"). Accordingly, despite the fact that other predicate findings

have been conceded by both parents, we will analyze the sufficiency of the evidence of endangerment grounds to support termination under subsections D or E.

Among the predicate findings that justify parental termination under Section 161.001(b)(1), a factfinder may find that a child has been endangered by a parent who has knowingly placed or allowed the child to remain in conditions or surroundings which endanger the child's physical or emotional well-being, *id.* § 161.001(b)(1)(D), or who has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child," *id.* § 161.001(b)(1)(E).

The trial court heard evidence that the mother had abused alcohol and drugs, which was supported by her drug tests that were positive for marijuana and alcohol. The referrals received by the Department alleged that she used drugs and alcohol in L.D.'s presence, and that she had been arrested for driving while intoxicated while he was in her car. The information received by the Department also indicated that the father was "in the home" and that he had found a "meth pipe" in the mother's laundry. The paternal grandmother knew the mother was an alcoholic and "abusive towards her son," whom she considered to be L.D.'s primary caregiver. There was no indication that the father attempted to remove L.D. from that environment.[2]

---

[2] The father argues that the allegations reported in the family service plan are hearsay which is insufficient to prove the truth of the reports. However, he did

The caseworker testified that the father had an extensive criminal history, including violence toward family members and drug-related offenses. After L.D. had been placed under the Department's care, the father tested positive for marijuana in one drug test, and positive for methamphetamine in another. The testimony of the caseworker and of the grandmother showed that the father's behavior put him at a continued risk for imprisonment.

We conclude that a reasonable factfinder could have formed a firm belief that L.D. was physically or emotionally endangered by the conditions in which his parents placed him, or by their conduct. TEX. FAM. CODE § 161.001(b)(1)(D) & (E); *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (noting a "parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct"); *Tex. Dep't. of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex. App.—San Antonio 2000, pet. denied) (endangerment finding supported by evidence of father's failure to make arrangements to safeguard child despite awareness of mother's substance abuse and its effects on child). None of the relevant evidence of endangerment was disputed, and thus the evidence was both legally and factually sufficient.

---

not object to the admission of the plans into evidence at trial. Thus, even to the extent the plans contain hearsay, the factfinder could have relied upon them. *See* TEX. R. EVID. 802.

12

## B.     Best interest

There is a strong presumption that the best interest of a child will be served by maintaining the parent-child relationship. *In re J.M.T.*, 519 S.W.3d 258, 268 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). In reviewing the sufficiency of the evidence that termination of the parent-child relationship was in the best interest of the child, we consider the factors set out in *Holley v. Adams*: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. 544 S.W.2d 367, 372 (Tex. 1976). The list is neither exhaustive, nor is evidence of all nine factors required to support a judgment of termination. *Id*. Evidence establishing the predicate acts under Section 161.001(1) may be relevant to determining the best interest of the child. *See C.H.*, 89 S.W.3d at 27–28.

*Desires and needs of the child.*—L.D. was approximately 18 months old at the time of trial, and the caseworker testified that he was too young to express

13

himself. When a child is too young to express his desires, the factfinder may consider evidence that the child has spent minimal time with the parent and that bonds may have developed with a foster family that has provided care. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). There was no direct evidence of how much time L.D. had spent with his father or mother prior to being placed in the Department's care, but the caseworker testified that he had been with the foster family since he was approximately six months old. Although she indicated that the foster family did not plan to adopt L.D., she testified that he had bonded with an older child in the potential adoptive placement, his visits with the placement had gone "great," and his biological sibling also was being placed in the same home. Both the mother and the father visited L.D. throughout the pendency of the suit, but each missed several visitation appointments. The mother emphasized evidence that the caseworker agreed she "became emotional" talking about L.D., but the mother's emotions, without more, are not probative of the child's desires. There was no evidence presented as to any specific emotional or physical needs of L.D. or how his needs had been or would be met by his parents, in his foster placement, or in the prospective adoptive placement.

*Endangerment of the child.*—In determining the best interest of a child, a factfinder may consider evidence of a parent's past behavior that endangered the well-being of the child and infer that the conduct may recur in the future if the child

is returned to the parent. *In re S.P.*, 509 S.W.3d 552, 557 (Tex. App.—El Paso 2016, no pet.). The factfinder also may consider the parent's past neglect or inability to meet the physical and emotional needs of the child in analyzing the factor of parental ability. *Id.* at 557–58.

The evidence at trial established that the mother abused alcohol. The caseworker testified that L.D. was initially placed in the Department's care after the mother was charged with driving while intoxicated with him in the car. The reports outlined in the family service plans alleged that the mother had used drugs in the home and would pass out while intoxicated, leaving L.D.'s eight-year-old sibling to care for him. The caseworker testified that the mother tested positive for marijuana at the beginning of the case, and she twice tested positive for alcohol while the case was pending. The drug and alcohol tests admitted into evidence supported this testimony. Although evidence showed that the mother participated in drug and alcohol counseling and she did not test positive for drugs or alcohol for a period of five months, she also failed to appear for all tests. The trial court reasonably could have inferred that she failed to report for testing to avoid a positive test because she was using drugs or alcohol. *J.M.T.*, 519 S.W.3d at 269.

The caseworker further testified that the mother never obtained a sponsor, as required by her family service plan. Although she started the 12-step program, she eventually stopped attending meetings. Along with the testimony of the caseworker

15

about an incident in which police found the mother very intoxicated, the evidence would allow a reasonable factfinder to form a firm belief or conviction that the mother's alcohol abuse was ongoing, and that the child accordingly would be endangered by being returned to her. The same evidence also supports the best-interest finding with respect to the mother's parenting abilities.

The family service plans also indicated that the father was present at the home at least some of the time, and it was alleged that he had found a "meth pipe" in the mother's laundry. The paternal grandmother indicated that she considered the father to be L.D.'s primary caregiver and that she knew the mother was an alcoholic and "abusive towards her son." Nevertheless, there was no evidence that the father took actions to protect L.D. *See M.J.M.L.*, 31 S.W.3d at 351.

The caseworker testified that the father had a long criminal history that included violence against family members and drug offenses. His criminal record was not introduced into evidence. Further details of the crimes, including when they were committed, were not established. Nevertheless, there was no evidence to dispute the caseworker's testimony. The evidence did indicate that the father's criminal behavior was ongoing based on the caseworker's testimony that he had ceased visits with L.D. and did not appear for two court dates, including trial, because he had violated probation and owed child support. The grandmother's testimony also supported this contention. She stated that her son had not attended

16

the "last couple visits" or trial because he had a child-support warrant and feared he would be arrested. A reasonable factfinder could infer that the father would continue to engage in activity that would subject him to possible incarceration, leaving L.D. alone, and endangering his physical and emotional well-being. *See In re S.A.P.*, 459 S.W.3d 134, 145 (Tex. App.—El Paso 2015, no pet.) (noting that routinely subjecting a child to the probability of being left alone because the parent is in jail endangers the child's physical and emotional well-being).

The father tested positive for methamphetamine in one hair-analysis drug screening, but he could not complete a subsequent drug screening "due to not having enough hair on his entire body" for a hair sample to be collected. Considering that the father previously had submitted to hair-analysis drug tests, but just a few months later did not have enough hair anywhere on his body to complete the test, a factfinder reasonably could infer that he was intentionally avoiding testing because he was using drugs. *See J.M.T.*, 519 S.W.3d at 269 (father's refusal to provide hair and fingernail sample for drug testing permitted the factfinder to infer that he refused testing because it would be positive); *see also In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied) (holding that a parent's use of illegal drugs during the pendency of a termination suit, when the parent is at risk of losing a child, supports a finding that parent's conduct endangered the child's physical or emotional well-being).

17

***Programs available to promote child's best interest.***—There was no evidence presented at trial about any programs available to the foster parents or the adoptive placement for L.D. The evidence did establish that several programs and services had been offered and provided to the mother and father through the family service plans to assist in providing a safe environment for L.D. Both the mother and father completed parenting classes. However, the father never completed the domestic violence program, and the mother dropped out of her 12-step program and did not obtain a sponsor. A reasonable factfinder could infer that the parents' failure to complete these steps indicate their inability to motivate themselves in the future. *See S.P.*, 509 S.W.3d at 558.

***Parental abilities, plans for the child, and stability of home.***—There was evidence at trial that the agency had identified an adoptive placement for L.D., the child's visits with the adoptive placement had gone well, and a biological sibling was to be placed in the same home. The mother emphasizes her partial completion of her family service plan and the "good working relationship" she had with the caseworker, nevertheless there was no evidence presented from either the mother or father as to any plans for L.D. if he were returned to either of them. The evidence indicated that neither had stable housing or income. The caseworker testified that the mother was homeless at the time of trial, and the father was living with his mother, whom the Department had rejected as a possible kinship placement. The

mother had provided the caseworker with contact information of her stepfather, and identified him as someone who could support her. However, the information was only provided within the two weeks before trial, the stepfather lived in another state, and there was no evidence that he could provide a stable environment for L.D.

***Acts or omissions of the parents.***—Although the mother and the father both completed several of the tasks and services in their respective family service plans, by the time of trial neither had followed through with the required steps for reunification with L.D. The mother had appeared for most of the prior court dates, and the father appeared for court dates until three months before trial, but neither parent appeared for the final permanency hearing or at trial. Both parents also missed several visits with L.D. The mother continued to abuse alcohol, which was the reason for L.D.'s initial placement in the Department's care. The caseworker testified that there was confusion between the Department's recommendations and recommendations of service providers, which a factfinder might reasonably consider to be a legitimate excuse for the mother's lapse in attendance, but the evidence also established that once the recommendation was made clear, she failed to return to meetings as promised. The father's excuses for missing visits, court dates, and the trial included other legal issues and that the case was "not his fault."

***Relevance of evidence about the grandmother.***—With respect to nearly all of the *Holley* factors, rather than presenting an argument about preserving his

relationship with his child, the father argues that termination is not in the child's best interest based trial on testimony from his mother—the child's grandmother—about her willingness to accept custody of L.D. Grandmother C.D. was not a party at trial. The evidence showed that the grandmother was rejected by the Department as a potential kinship placement. At the time of trial she had not been in contact with the child for approximately one year, since he was six months old. In other words, there was no evidence of any bonding between the child and his grandmother, who never attempted to intervene in the case. No party to the court proceedings ever asked that the court place the child with the grandmother; that request was made only by the grandmother herself during her live trial testimony. While the availability of grandmother C.D. to be a resource in the life of her grandchild L.D. certainly was relevant to the best interest of the child, the factfinder could have discounted that evidence in light of other evidence supporting the Department's judgment that she was not an eligible placement for the child, including evidence linking her to criminal activity and child abuse.

*　　*　　*

After reviewing all of the evidence in the light most favorable to the trial court's best-interest finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of the mother's and father's parental rights was in L.D.'s best interest. We further conclude, viewed in light of

20

the entire record, any disputed evidence that a reasonable factfinder could not have resolved in favor of the best-interest finding was not so significant that the factfinder could not reasonably have formed a firm belief or conviction. Thus, we hold the evidence was legally and factually sufficient to support termination of both the mother's and the father's parental rights to L.D.

## II.    Appointment of managing conservator

Consistent with the father's argument that his parental rights should not have been terminated, he also contends that the trial court abused its discretion by appointing the Department as L.D.'s sole managing conservator. He further contends that if this court were to conclude that the evidence was sufficient to overcome the presumption in favor of parental appointment, it nevertheless should reverse the trial court's decision to appoint the Department as the managing conservator and award conservatorship to the paternal grandmother.

If the court terminates the parental rights of both parents, "it shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE § 161.207(a). We review a trial court's appointment of a managing conservator for abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). The primary consideration in determining conservatorship is always the best interest of the child. TEX. FAM. CODE § 153.002; *see also In re A.C.*, 394 S.W.3d 633, 644

21

(Tex. App.—Houston [1st Dist.] 2012, no pet.); *Dep't of Family & Protective Servs. v. Alts. in Motion*, 210 S.W.3d 794, 804 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). "As long as some evidence of substantive and probative character exists to support the trial court's decision," we will affirm the trial court's appointment. *J.A.J.*, 243 S.W.3d at 616; *see also In re J.M.I.*, No. 01-16-00829-CV, 2017 WL 1175568, at *6 (Tex. App.—Houston [1st Dist.] Mar. 30, 2017, no pet.) (memo. op.).

We have concluded that the evidence was sufficient to support the termination of both parents' rights with respect to L.D. under the more stringent clear-and-convincing evidence standard. We therefore conclude that the trial court did not abuse its discretion in appointing a non-parent as L.D.'s managing conservator. *See In re L.G.R.*, 498 S.W.3d 195, 207 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

The father also contends that the appointment of his mother as managing conservator, rather than the Department, would serve the best interests of L.D. While some evidence would have supported placing L.D. with his grandmother, there was also evidence that her appointment would not have been in the child's best interest. Grandmother C.D. had a history of involvement with the Department, particularly a 1993 accusation of physical abuse of her son that the Department found "reason to believe." The grandmother's criminal history included several misdemeanor convictions. Most of her criminal offenses occurred over 20 years before trial, but

22

the most recent offense was a conviction five years before trial for driving while intoxicated.

The Department's risk assessment noted the grandmother's failure to take responsibility for her past crimes. The caseworker testified that the Department had no intention of placing the child with her because of her criminal history and because the accusation of abuse barred the placement of any child in her home.

At the time of trial, the grandmother had not seen L.D. for approximately one year. She said this was because she worked five days a week, and part-time on the weekend. A factfinder reasonably could infer that the grandmother would have limited time to spend with L.D.

The grandmother testified that her son was not living with her, but the caseworker stated he had moved back into his mother's house, and she had seen him there the week before trial. The kinship-care assessment indicated that the grandmother recognized L.D.'s mother's dangerous behavior, but she considered her son to be a good father. The court could have believed the biological father was living at the grandmother's home and that the child therefore would not have been protected adequately from unsafe conditions. *See A.C.*, 394 S.W.3d at 644 (holding that when child's parents both had a history of drug and alcohol abuse and father had numerous criminal charges, evidence that the child's grandmother would allow the

parents to stay and visit supported a conclusion of an improper parent-child relationship).

While the Department presented only limited evidence of conditions of the adoptive placement, it was established that L.D.'s visits with the family "went great," that he had formed bonds, and that he would be placed with a biological sibling. The caseworker indicated that she had visited with the proposed adoptive placement and believed it to be "a wonderful placement" for the child "to be in and thrive." Considering the evidence presented supporting a finding that placement with the grandmother would not be in the best interest of the child, the evidence was sufficient to support the court's determination, as an exercise of its discretion, to name the Department as sole managing conservator.

We overrule the father's objection to the appointment of the Department as L.D.'s sole managing conservator.

**Conclusion**

We affirm the judgment of the trial court.


Michael Massengale
Justice

Panel consists of Justices Jennings, Massengale, and Caughey.

24