

# NUMBER 13-19-00008-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

## IN THE INTEREST OF C.D.L.R., C.D.L.R., E.M., CHILDREN

---

### On appeal from the County Court at Law No. 5
### of Nueces County, Texas.

---

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Longoria
Memorandum Opinion by Chief Justice Contreras**

The trial court terminated appellant Father's parental rights to his daughter E.M.[1] By two issues, Father argues that: (1) the evidence is legally and factually insufficient to support termination under both § 161.001(b)(1)(E) and § 161.001(b)(1)(Q) of the Texas Family Code, and (2) the evidence is insufficient to support a finding that termination was in the best interest of the child. Because we conclude the evidence was legally insufficient

---

[1] To protect the identity of the child, we refer to those involved in the case by aliases, as necessary. *See* TEX. R. APP. P. 9.8(b).

under both § 161.001(b)(1)(E) and § 161.001(b)(1)(Q), we affirm in part, reverse in part, and remand for further proceedings.

## I.  BACKGROUND

On September 16, 2016, appellee the Department of Family and Protective Services (the Department) filed an amended petition to terminate the parental rights of Mother and the respective fathers of C.D.L.R., C.D.L.R., and E.M.  Mother, however, passed away before trial began.  After a bench trial on October 3, 2018, the trial court terminated the parental rights of the fathers of all three children.  Father of E.M. appeals.  E.M. was born in 2016 and was two years old at the time of trial; Father was twenty-eight years old and has been incarcerated since before E.M.'s birth.

Before any witnesses were called, the trial court admitted into evidence multiple exhibits, including:  (1) Father's 2008 judgment of conviction for injury to a child; (2) a 2008 motion to revoke Father's community supervision for injury to a child, alleging Father committed a new offense of burglary of a habitation and tested positive for marijuana in December 2007 and January 2008; (2) two 2016 judgments adjudicating guilt for two offenses for burglary of a habitation; (3) a July 2015 motion to revoke Father's community supervision for the burglary offenses, alleging Father smoked synthetic marijuana "several times" while at a transitional treatment center in April 2015[2]; (5) a July 2016 motion to revoke Father's community supervision for the burglary offenses, alleging Father committed the offense of "possession of a substance" and tested positive for marijuana and benzodiazepines in May 2016[3]; (6) an assault victim's statement made by

---

[2] The April 2015 motion to revoke also alleged Father, while at the transitional treatment center, refused to take his mental health medication for two weeks, tested positive for synthetic marijuana, smoked a cigarette in violation of the center's rules, and was unsuccessfully discharged from the program.

[3] The July 2016 motion to revoke also alleged Father admitted to his supervising officer that he had smoked marijuana in May 2016, that Father had failed to report in March and June of 2016, and that Father

2

Mother in June 2016, before E.M. was born, where she accused Father of assaulting her by pushing her multiple times, causing swelling of Mother's right arm and pain in her neck; and (7) an incident/investigation report and supplemental notes concerning Mother's allegation of assault against Father. In the incident report regarding the assault allegation by Mother against Father, a detective wrote:

> [Mother] stated that they argued in her car and [Father] pushed her. [Mother] stated she got out of the car and then [Father] tried pushing her back in the vehicle and she wound up getting in the driver[']s seat trying to leave [Father]. [Mother] stated that [Father] then reached in the vehicle and tried pushing her to get in. [Mother] stated her head hit the window. [Mother] stated she was able to drive away without [Father] and called the police using another person [sic] phone. [Mother] stated she had no injury but the assault caused her pain. [Mother] did not want to conduct a video interview but she did fill out an assault victim's statement form. [Mother] also stated [Father] would not try to kill her and she did not want to partake in the lethality assessment survey. [Father] was not on scene and not contacted at the time of this report.
>
> . . . .
>
> I located the written assault victim[']s statement. [Mother] wrote that [Father] assaulted her. She marked that he hit her and pushed her, she wrote she was assaulted on her "left arm and right side of my head." She marked that it was painful and did causes [sic] bleeding, bruises or swelling. She described the injury as "swelling on her right arm and my neck is in pain." She wrote she was assaulted with "his hands." She wrote, "he kept pushing me while I was in [the] passenger seat, then as I got in the driver seat he was grabbing and pushing me. My head kept hitting the passenger seat."

Rey Rangel, an investigator with the Department, was the first witness called at trial. Rangel testified regarding the circumstances that led to the Department's intervention into Mother and the three children. According to Rangel, the Department was informed that Mother was using illicit drugs. Rangel believed that Mother's drug addiction made it inappropriate for her to care for the children, and the children were taken

---

had failed to pay court costs and fees. The exhibits also included a June 2016 motion to revoke Father's probation, making the same allegations, as in the July 2016 motion to revoke.

3

into conservatorship by the Department. According to Rangel, Father was not available at the time of removal because he was and still is incarcerated. Rangel testified that, at the time of trial, the children were currently placed with the maternal grandparents, and he recommended they remain there.

Yliana Carlisle, another investigator with the Department, testified she had been in charge of the case for two months at the time of trial. Carlisle stated that E.M. could not be placed with Father because he was incarcerated. Carlisle further stated that Father's projected release date was in 2020, but that his sentence could last until 2026. Carlisle explained that: she had made two home visits to the maternal grandparents' home; she believed the grandparents are wonderful caregivers to the kids; the kids are happy, close, and bonded with the grandparents; she had no concerns about the children's placement with their maternal grandparents; and she believed it would be in the best interest of the children to remain with the grandparents.[4] According to Carlisle, Grandmother speaks with Father's sister regularly and with Father sometimes by phone and the family "is getting along well." Carlisle testified there was no indication that Father was the cause of the removal; instead, he is a "non-offending parent." Carlisle testified there was nothing in the exhibits admitted that indicated the injury suffered by the fourteen-year-old victim of Father's offense for injury to a child was serious.

Father testified he was seventeen years old at the time of his offense for injury to a child and that he was convicted for punching a fourteen-year-old boy in the face. Father stated: "Just to be completely honest, sir, it was just—to me, I was just fighting with another teenager. I was a teenager. I made the mistake of getting into a fight with another

---

[4] Carlisle did not testify whether or not it was in E.M.'s best interest for Father's right to be terminated.

4

teenager."  The Department asked Father about his two convictions for burglary of a habitation, and Father responded:

> Well, at the time of those offenses, sir, I was 18 years old.  And, you know, if you look at them, I was 18.  They happened in 2008.  I haven't gotten no new felonies since then.  I was just young and I could say I was on drugs back then, but in today's times, I won't let that affect my relationship with my daughter.[5]

Father was incarcerated in 2016, prior to E.M.'s birth, after his community supervision for the two burglary offenses was revoked.   Father explained he spends his time reading, working out, and staying out of trouble.  According to Father, he has taken peer education courses, was participating in Bible study through mail correspondence, had requested parenting courses through mail correspondence, and was on the wait list for a computer trade course.  Father explained that E.M.'s birth changed his outlook on life and that Mother had taken E.M. to see Father a few times while he was incarcerated, including for E.M.'s first birthday.

Father testified the maternal grandparents were "wonderful people" and that he was "very thankful for them taking responsibility of my little girl."  Father stated that Grandmother sends him photos of E.M., that he looks at her pictures all the time, and that he writes Grandmother at least once a month to check up on E.M.'s wellbeing.  Father stated he wanted to be a part of E.M.'s life and he asked the trial court not to terminate his parental rights.

Grandmother testified she met Father approximately six months before Mother became pregnant with E.M.  She testified Father previously worked a night job cleaning.  Grandmother thought that Father had smoked marijuana with Mother in the past, but that

---

[5] No other testimony was elicited from Father regarding Father's past drug use.

she was unaware of any other drug use by Father, and she did not believe Father to be a violent man. The Department emphasized Father's conviction for injury to a child:

> [Department]: I'm going to ask this Honorable Court to terminate the parental rights of [Father]. One, because he's serving a lengthy period of incarceration; and, two, because he injured a child. At 17, he punched a child. 14. In the face. That doesn't sound like much, but he was indicted for it . . . . What do you think of that?
>
> [Grandmother]: My personal belief is he was still very young. He was a kid, too. I'm not real familiar with street fights, but, I mean, I don't hold it against him because I think he was a child at the time, too.

Grandmother testified she would be okay with E.M. being around Father after he is released:

> If he shows me he's a good person and he's not doing anything wrong[, then] I welcome him to be the father to her that she probably should have. I mean, I don't want to take her out of our home, but I would love and welcome him to be the father.

According to Grandmother, she would not let Father visit E.M. unless he is sober and clean from drugs. Grandmother testified she loved all the children dearly, wanted them to be together, and that they seem very happy. Grandmother stated she was happy to have the children, and she confirmed Father wrote her a letter once a month and frequently asked about E.M.'s overall wellbeing. Grandmother believed Father loves E.M. She testified she and her husband would be willing to care for E.M. regardless of whether E.M. is adoptable or whether they were given permanent managing conservatorship. Grandmother testified she would be willing to care for E.M. on behalf of Father and that she understood that, even if Father's parental rights were not terminated, then Father would still have to prove it is in E.M.'s best interest before he would have any visitation rights to her. Grandmother believed that Father's participation in parenting classes

6

through mail correspondence showed that Father was looking to be the best parent he could be for E.M.

During closing arguments, the Department stated:

[Father's] parental rights should also be terminated under 161.001(b)(1)(E). (E) because the child was left in an environment of endangerment. Absolutely. The mother is deceased. Serious drug issues. Serious problems with him, too, that make it difficult for me to even suggest that there's enough time for him to qualify as a parent. He does not have any trades. At the very most, he is an unskilled maintenance—building maintenance worker, at the very most.[6] He's 28 years old. I wish him well, but he's not an adequate parent. You should terminate his parental rights immediately. And not wait. The law in Texas is clear. Childhood does not wait for the parent to become adequate. Have you ever seen what a 14-year-old child looks like when you punch him in the face? I can tell you what happens. I don't have to. You know what happens.

E.M.'s attorney ad litem recommended that the trial court not terminate Father's parental rights, appoint grandparents as the sole managing conservators, and appoint Father as a possessory conservator "if and when he can get back into the child's life."

The trial court found there were grounds to terminate Father's parental rights under § 161.001(b)(1)(E) and § 161.001(b)(1)(Q) and that termination was in the best interest of E.M. This appeal followed.

## II.    DISCUSSION

By his first issue, Father argues the evidence is legally and factually insufficient to support termination under either § 161.001(b)(1)(E) or § 161.001(b)(1)(Q) of the Texas Family Code.

## A.  Applicable Law and Standard of Review

---

[6] We note that a trial court "may not make a finding under [§ 161.001(b)] and order termination of the parent-child relationship based on evidence that the parent . . . is economically disadvantaged . . . ." TEX. FAM. CODE ANN. § 161.001(c)(2).

7

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi–Edinburg 2010, no pet.); *see Stantosky v. Kramer*, 455 U.S. 745, 753 (1982). "Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases." *In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring). Accordingly, termination proceedings must be strictly scrutinized. *Id.* at 112. In such cases, due process requires application of the "clear and convincing" standard of proof. *Id.* (citing *Stantosky*, 455 U.S. at 769; *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)). This intermediate standard falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re L.J.N.*, 329 S.W.3d at 671. "'Clear and convincing evidence' means a 'measure of degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re N.G.*, No. 18-0508, __ S.W.3d__, __, 2019 WL 2147263, at *3 (Tex. May 17, 2019) (per curiam) (quoting Tᴇx. Fᴀᴍ. Cᴏᴅᴇ Aɴɴ. § 101.007); *see In re K.M.L.*, 443 S.W.3d at 112–13 ("In cases requiring clear and convincing evidence, even evidence that does more than raise surmise and suspicion will not suffice unless that evidence is capable of producing a firm belief or conviction that the allegation is true.").

The trial court may order the termination of the parent-child relationship if the court finds by clear and convincing evidence that: (1) the parent committed an act or omission described in family code subsection 161.001(b)(1) and (2) termination is in the best

8

interest of the child.  TEX. FAM. CODE ANN. § 161.001(b); *In re N.G.*, __ S.W.3d at __, 2019

WL 2147263, at *1.  "To affirm a termination judgment on appeal, a court need uphold

only one termination ground—in addition to upholding a challenged best interest finding—

even if the trial court based the termination on more than one ground."  *In re N.G.*, __

S.W.3d at __, 2019 WL 2147263, at *1; *see* TEX. FAM. CODE ANN. § 161.001(b).  However,

we must always review any sufficiency challenge on appeal to a termination under

subsection (E).  *See In re N.G.*, __ S.W.3d at __, 2019 WL 2147263, at *3 ("When a

parent has presented the issue on appeal, an appellate court that denies review of a

section 161.001(b)(1)(D) or (E) finding deprives the parent of a meaningful appeal and

eliminates the parent's only chance for review of a finding that will be binding as to

parental rights to other children.").

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.  To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so.  A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.  This does not mean that a court must disregard *all* evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.
>
> If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient.

*In re J.F.C.*, 96 S.W.3d 256, 266–67 (Tex. 2002) (emphasis in original) (footnotes and

quotation marks omitted).

## B.    Termination Under § 161.001(b)(1)(E)

Subsection 161.001(b)(1)(E) allows for termination of parental rights if clear and convincing evidence supports a conclusion that the parent "engaged in conduct . . . which endangers the physical or emotional well-being of the child."   TEX. FAM. CODE ANN. § 161.001(b)(1)(E).   "Endanger" means "to expose to loss or injury [or] to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).   The term means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but "it is not necessary that the conduct be directed at the child or that the child actually suffers injury."   *Id.*; *see In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009).   "Indeed, the law does not require that the child be a victim of abusive conduct before the Department can involuntarily terminate a parent's right to the child."   *In re C.J.F.*, 134 S.W.3d 343, 352 (Tex. App.—Amarillo 2003, pet. denied) (citing *Dallas Cty. Child Prot. Servs. v. Bowling*, 833 S.W.2d 730, 733 (Tex. App.—Dallas 1992, no pet.)).

The parent's conduct both before and after the child is born is relevant.   *In re R.F.*, 115 S.W.3d 804, 810 (Tex. App.—Dallas 2003, no pet.); *In re D.M.*, 58 S.W.3d at 812 ("It is inconsequential that the parental conduct considered in a termination proceeding occurred before the child's birth."); *see In re J.O.A.*, 283 S.W.3d at 345.   The relevant inquiry is whether evidence exists that a parental course of conduct endangered the child's physical or emotional well-being.   *Walker*, 312 S.W.3d at 616–17.

"[E]vidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices."   *In re N.J.H.*, No. 01-18-00564-CV, __ S.W.3d __, __, 2018 WL 6617360, at *6 (Tex. App.—Houston [1st Dist.] Dec. 18, 2018, pet. denied) (quoting *In re J.O.A.*, 283 S.W.3d at 346); *see also In re T.E.G.*, No. 01-14-00051-CV, 2014 WL 1878919, at *7 (Tex. App.—

10

Houston [1st Dist.] May 8, 2014, no pet.) (mem. op.) ("Nor was the trial court required to conclude that P.M. had adequately addressed her drug abuse issues in light of a single negative drug test."). "However, 'the relationship of the parent and child, as well as efforts to improve or enhance parenting skills, are relevant in determining whether a parent's conduct results in 'endangerment' under section 161.001(1)(E), even where the parent is incarcerated.'" *In re S.A.P.*, 459 S.W.3d at 145 (quoting *In re D.T.*, 34 S.W.3d 625, 640 (Tex. App.—Fort Worth 2000, pet. denied)). Also, "Texas case law makes clear that in a termination suit, 'acts done in the distant past, without showing a present or future danger to a child, cannot be sufficient to terminate parental rights." *In re R.R.F.*, 846 S.W.2d 65, 69 (Tex. App.—Corpus Christi–Edinburg 1992, writ denied), *overruled in part on other grounds by In re D.S.P.*, 210 S.W.3d 776, 780–81 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.) (citing *Wetzel v. Wetzel*, 715 S.W.2d 387, 391 (Tex. App.—Dallas 1986, no writ); *Carter v. Dallas Cty. Child Welfare Unit*, 532 S.W.2d 140, 142 (Tex. App.—Dallas 1975, no writ); *see Hendricks v. Curry*, 401 S.W.2d 796, 800 (Tex. 1966) (stating that termination of parental rights should not be based solely on conditions that existed in the distant past but no longer exist); *see also In re S.M.L.*, 171 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (placing "particular significance" on crimes committed after child's birth because parent committed them knowing they would result in incarceration, leaving the child without his or her support).

### 1. Criminal Activity

"[I]ncarceration alone will not support termination, [but] evidence of criminal conduct, convictions, and imprisonment may support a finding of endangerment under subsection (E)." *In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see Boyd*, 727 S.W.2d at 533; *In re S.A.P.*, 459 S.W.3d 134, 145 (Tex.

11

App.—El Paso 2015, no pet.). In considering the acts and omissions of a parent leading to the parent's incarceration, we consider the expected length of imprisonment and whether it can be inferred from the criminal conduct that the parent has endangered the safety of the child. *In re F.M.E.A.F.*, No. 14-18-00865-CV, __ S.W.3d __, __, 2019 WL 1291314, at *10 (Tex. App.—Houston [14th Dist.] Mar. 21, 2019, no pet. h.); *see In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). "Termination of parental rights should not become an additional punishment for imprisonment for any crime." *In re F.M.E.A.F.*, __ S.W.3d at __, 2019 WL 1291314, at *10; *In re C.T.E.*, 95 S.W.3d at 466; *see also In re E.N.C.*, 384 S.W.3d 796, 805 (Tex. 2012) (rejecting proposition that any offense committed by a parent that could lead to imprisonment or confinement would establish endangerment to children). However, routinely subjecting a child to the probability that the child will be left alone because his parent is in jail endangers the child's physical and emotional well-being. *In re J.J.L.*, __ S.W.3d at __, 2019 WL 20008004, at *8; *In re S.M.*, 389 S.W.3d 483, 492 (Tex. App.— El Paso 2012, no pet.).

### 2. Drug Abuse

"[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d at 345. "A parent's continuing substance abuse can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well being." *In re J.J.L.*, __ S.W.3d at __, 2019 WL 2000804, at *7; *In re J.O.A.*, 283 S.W.3d at 345. Illegal drug use may support termination under § 161.001(b)(1)(E), even if it transpires outside the child's presence, because "it exposes the child to the possibility that the parent may be impaired or imprisoned." *See In re J.O.A.*, 283 S.W.3d at 345; *In re N.J.H.*, __ S.W.3d at __, 2018 WL 6617360, at *5;

*Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).  Furthermore, a parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being.  *In re J.J.L.*, __ S.W.3d at __, 2019 WL 2000804, at *7; *In re N.J.H.*, __ S.W.3d at __, 2018 WL 6617360, at *5; *In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.) ("[P]arent's engaging in illegal drug activity after agreeing not to do so in a service plan for reunification with her children is sufficient to establish clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being of her children").  "The fact finder may give 'great weight' to the 'significant factor' of drug-related conduct."  *In re J.J.L.*, __ S.W.3d at __, 2019 WL 2000804, at *8 (quoting *L.G.R.*, 498 S.W.3d at 204).

### 3.  Knowledge of Other Parent's Drug Use

"One parent's drug-related endangerment of the child may be imputed to the other parent."  *In re F.E.N.*, 542 S.W.3d 752, 764 (Tex. App.—Houston [14th Dist.] 2018, no pet.).  However, the father must have had knowledge of the mother's drug use for his inaction to constitute endangerment.  *Id.*; *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(E) (requiring knowledge that others are engaging in endangering conduct).

### 4.  Domestic Violence and Propensity for Violence

"Domestic violence, want of self-control[,] and propensity for violence may be considered as evidence of endangerment."  *In re C.E.K.*, 214 S.W.3d 492, 496–97 (Tex. App.—Dallas 2006, no pet.) (citing *In re C.F.J.*, 134 S.W.3d 343, 351 (Tex. App.—Amarillo 2003, no pet.)); *see In re N.J.H.*, __ S.W.3d at __, 2018 WL 6617360, at *6 ("Abusive and violent criminal conduct by a parent can also produce an environment that

13

endangers the child's well-being, and evidence that the person has engaged in such conduct in the past permits an inference that the person will continue violent behavior in the future.").

Sometimes, if a parent abuses the other parent or children, that conduct can support a finding of endangerment even against a child who was not born at the time of the conduct. *See In re J.F.C.*, 96 S.W.3d 256, 270–72 (Tex. 2002); *see, e.g.*, *In re S.B.*, 207 S.W.3d 877, 885 (Tex. App.—Fort Worth 2006, no pet.) (affirming termination under subsection (E) when father murdered mother while the children were present); *In re S.K.S.*, 648 S.W.2d 402, 404 (Tex. App.—San Antonio 1983, no writ) (affirming termination based on father's murder conviction for the murder of the mother); *Allred v. Harris Cty. Child Welfare Unit*, 615 S.W.2d 803, 806 (Tex. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.) (concluding evidence supported termination based on endangerment when father beat the mother upon learning she was pregnant, threatened to cause her to miscarry by pushing her down the stairs, and engaged in criminal conduct resulting in the revocation of his parole).

### 5. Legal Sufficiency

"When presented with legal and factual sufficiency challenges, the reviewing court first reviews the legal sufficiency of the evidence." *In re D.T.*, 34 S.W.3d at 630.

We begin with the evidence of criminal conduct by Father. As to Father's 2008 conviction for injury to a child, it occurred when Father was seventeen years old and punched a fourteen-year-old boy in the face. This conviction occurred approximately eight years prior to trial, and it cannot be inferred that Father endangered the safety of E.M. from a fight between two teenagers eight years before the termination proceeding. *See In re F.M.E.A.F.*, __ S.W.3d at __, 2019 WL 1291314, at *11; *In re C.T.E.*, 95 S.W.3d

14

at 466–67; *In re R.R.F.*, 846 S.W.2d at 68–69 (concluding that allegations of the father's misconduct towards his children five years prior was too remote to support termination where there was no proof that this conduct created a present or future threat to the children); *Wetzel*, 715 S.W.2d at 391 ("We hold . . . that misconduct towards a child in the distant past, standing alone, is insufficient to support the termination of parental rights."). The same can be said of Father's convictions for burglary, which occurred approximately seven years prior to trial.[7]  *See In re F.M.E.A.F.*, No. 14-18-00865-CV, __ S.W.3d at __, 2019 WL 1291314, at *11 (concluding that mother's "theft, trespass, and resisting arrest convictions are not the type from which it can be inferred that she endangered [daughter's] physical safety"); *In re C.T.E.*, 95 S.W.3d at 466–67 67 (concluding that evidence was insufficient to prove termination was in the child's best interest when the father's criminal conduct of theft "was not the type from which it can be inferred that he has endangered the safety of his children"); *In re R.R.F.*, 846 S.W.2d at 68–69; *Wetzel*, 715 S.W.2d at 391.  We do note that the last motion to revoke Father's community supervision alleged that he committed a new offense for "possession of a substance" in 2016; however, there is nothing in the record supporting the allegation of this offense or that it resulted in a conviction.  There is also no evidence of any misconduct by Father since his incarceration. *See In re J.F.C.*, 96 S.W.3d at 266 ("Disregarding undisputed facts that do not support the finding could skew the [legal sufficiency] analysis of whether there is clear and convincing evidence."); *cf. In re S.F.*, 32 S.W.3d 318, 321–22 (Tex. App.—San Antonio 2000, no pet.) (noting father's misconduct during incarceration, along with behavior before

---

[7] While Father's guilt for the burglary offenses was adjudicated in 2016, the criminal conduct occurred in 2008.

imprisonment and child's birth, showed father engaged in a course of conduct that was detrimental to child).

As to Father's drug use, there was evidence that Father: smoked marijuana with Mother sometime in 2015 or 2016; tested positive for marijuana and benzodiazepines in May 2016; was alleged to have committed a new offense of "possession of a substance" in 2016 leading, in part, to a motion to revoke his community supervision; smoked synthetic marijuana "several times" while at a transitional treatment center in April 2015; and tested positive for marijuana in December 2007 and 2008. There was, however, no evidence that Father engaged in any drug activity after being incarcerated or after the Department instituted the termination suit. *Cf. In re J.J.L.*, __ S.W.3d at __, 2019 WL 2000804, at *7; *In re N.J.H.*, __ S.W.3d at __, 2018 WL 6617360, at *5; *In re T.N.*, 180 S.W.3d at 383. We conclude that these instances of drug use during an approximately eight-year period do not establish that Father knowingly engaged in conduct that endangered the wellbeing of E.M. *Cf. In re J.J.L.*, __ S.W.3d at __, 2019 WL 2000804, at *7; *In re A.J.H.*, 205 S.W.3d 79, 81 (Tex. App.—Fort Worth 2006, no pet.) (finding sufficient evidence for termination under § 161.001(b)(1)(E) where, "despite ongoing CPS proceedings, he smoked marijuana daily, refused anger management classes, refused drug treatment, refused counseling, and indicated that he intended to continue to smoke marijuana"). In regard to Mother's drug use, there was no evidence presented that Father had knowledge of her drug use that led to the Department's intervention. Therefore, Mother's drug use cannot be imputed to Father.[8] *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E); *In re F.E.N.*, 542 S.W.3d at 764.

---

[8] There is also no evidence in the record regarding any details of the "illicit drug use" by Mother that led to the Department's intervention.

16

As to domestic violence and propensity for violence, Father has two alleged instances of violent conduct eight years apart. Neither incident, based on the record, caused serious bodily injury. As previously concluded, his conviction for injury to a child is too remote to support termination and does not support an inference that he endangered E.M. There is also no evidence that Father abused any other child.

Finally, Father testified that: E.M.'s birth changed his outlook in life, he communicates with the child's caregivers and inquires as to her wellbeing once a month, has pictures of E.M. he looks at every day, has requested parenting courses through correspondence, and was visited by E.M. on her first birthday and other times while Mother was alive. *See In re S.A.P.*, 459 S.W.3d at 145 (quoting *In re D.T.*, 34 S.W.3d at 640) ("However, 'the relationship of the parent and child, as well as efforts to improve or enhance parenting skills, are relevant in determining whether a parent's conduct results in 'endangerment' under section 161.001(1)(E), even where the parent is incarcerated."); *cf. In re L.M.*, No. 14-18-01047-CV, __ S.W.3d __, __, 2019 WL 1526426, at *8 (Tex. App.—Houston [14th Dist.] Apr. 9, 2019, no pet. h.) ("A lack of all contact with a child without any proffered excuse and no effort to ensure her well-being—coupled with multiple episodes of incarceration, the potential for future incarceration due to drug-related activity, and violence against the mother—is sufficient to support a termination finding based on endangerment."). The trier of fact also could not have disregarded or found incredible Grandmother's undisputed testimony that Father loves E.M. *See In re J.F.C.*, 96 S.W.3d at 266.

Father's criminal history is properly considered as part of the review of the legal sufficiency of the evidence. *See In re S.A.P.*, 459 S.W.3d at 145. Nevertheless, viewing the evidence in the light most favorable to the verdict, we conclude that Father's

17

convictions do not establish that Father knowingly engaged in a course of conduct that endangered E.M.'s wellbeing. *See In re F.M.E.A.F.*, ___ S.W.3d ___, ___, 2019 WL 1291314, at *11; *In re C.T.E.*, 95 S.W.3d at 466–67; *In re R.R.F.*, 846 S.W.2d at 68–69; *Wetzel*, 715 S.W.2d at 391; *cf. In re S.M.L.*, 171 S.W.3d at 479 (concluding that Father's incarceration for assaulting a police officer once before and once after child birth, as well as his angry outbursts during termination hearing supported termination under subsection E; Father's "most recent assault on a police office is particularly significant because he committed the crime knowing that . . . it would result in his incarceration" and leave his daughter without support); *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.) (concluding that Father's incarceration for sexually assaulting a fifteen-month-old child and three other adjudications for aggravated sexual assault of child supported a finding that Father engaged in a course of conduct which endangered the emotional well-being of his child and showed a present and future danger to the child); *In re M.D.S.*, 1 S.W.3d 190, 198–99 (Tex. App.—Amarillo 1999, no pet.) (concluding that sentences for burglary and sex with a minor, as well as prior convictions of marijuana possession, established endangering course of conduct).

Furthermore, viewing the evidence in the light most favorable to the trial court's verdict, we conclude that the evidence is legally insufficient to support termination under subsection (E). Based on our preceding discussion, the evidence before the trial court supporting termination included Father's approximately eight instances of drug use throughout an almost eight-year period; one instance of violence perpetrated on the Mother by Father before E.M.'s birth which did not cause serious injury; and remote convictions and criminal acts that do not support an inference that Father endangered E.M. Based on the evidence, we conclude that a reasonable factfinder could not form a

18

firm belief or conviction that Father knowingly engaged in conduct which endangered the physical or emotional well-being of E.M. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E); *In re K.M.L.*, 443 S.W.3d at 112–13 ("In cases requiring clear and convincing evidence, even evidence that does more than raise surmise and suspicion will not suffice unless that evidence is capable of producing a firm belief or conviction that the allegation is true."); *In re F.M.E.A.F.*, __ S.W.3d at __, 2019 WL 1291314, at *11; *In re D.T.*, 34 S.W.3d at 636 ("In the cases we have found involving termination of parental rights of imprisoned parents, endangerment to a child could easily have been inferred from the underlying conduct of the parent."); *cf. In re J.O.A.*, 283 S.W.3d at 336 (concluding father's admission of daily marijuana use before twins birth, history of domestic violence with mother, and failure to comply with service plan after twins were removed were sufficient to support termination under (E) despite father's "significant" recent improvements in conduct); *Boyd*, 727 S.W.2d at 533–34 (concluding evidence was sufficient for termination under (E) when father was arrested for burglary both before and after child's birth and there was "vague" evidence that father had supported the child while living with the child while on parole); *In re A.J.H.*, 205 S.W.3d at 81; *Robinson v. Tex. Dep't of Protective & Regulatory Servs.,* 89 S.W.3d 679, 686–87 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (noting that parent engaging in illegal drug activity after agreeing not to do so in a service plan for reunification with her children is sufficient to establish clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being of her children); *In re K.M.M.*, 993 S.W.2d at 228. The facts of this case present no "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *See In re K.M.L.*, 443 S.W.3d at 112–13; *In re J.O.A.*, 283 S.W.3d at 345; *Boyd*, 727 S.W.2d at 533.

19

## C.    Termination Under § 161.001(b)(1)(Q)

Father also challenges the trial court's determination that there was clear and convincing evidence supporting termination under § 161.001(b)(1)(Q).

Under § 161.001(b)(1)(Q), a parent's rights can be terminated when a parent has knowingly engaged in criminal conduct that has resulted in the parent's conviction of an offense, confinement, and inability to care for the child for not less than two years from the date of the filing of the petition.  TEX. FAM. CODE ANN. § 161.001(b)(1)(Q).  The purpose of subsection (Q) is to protect children from neglect.  *See In re A.V.*, 113 S.W.3d 355, 360 (Tex. 2003); *see also In re K.G.*, No. 11-12-00130-CV, 2012 WL 3765058, at *3 (Tex. App.—Eastland Aug. 31, 2012, no pet.) (mem. op.).

Incarceration alone does not show inability to care for a child.  *In re Caballero*, 53 S.W.3d 391, 395 (Tex. App.—Amarillo 2001, pet. denied).  Otherwise, the termination of parental rights could become an additional punishment automatically imposed along with imprisonment for almost any crime.  *In re E.S.S.*, 131 S.W.3d 632, 639 (Tex. App.—Fort Worth 2004, no pet.).  We employ a burden-shifting analysis to assess an incarcerated parent's ability to care for a child.  *In re Caballero*, 53 S.W.3d at 396; *see also In re S.R.*, No. 13-15-00114-CV, 2015 WL 3657747, at *2 (Tex. App.—Corpus Christi–Edinburg June 11, 2015, no pet.) (mem. op.) (adopting *Caballero*'s analysis of the burden of proof under subsection (Q)).  The party seeking termination must first establish that the parent will remain in confinement for the requisite period.  *In re B.D.A.*, 546 S.W.3d 346, 358 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *In re H.B.C.*, 482 S.W.3d 696, 702 (Tex. App.—Texarkana 2016, no pet.).  The burden then shifts to the parent to produce "some evidence" as to how he would provide or arrange to provide care for the child during his incarceration.  *In re B.D.A.*, 546 S.W.3d at 358; *In re Caballero*, 53 S.W.3d at 396.  "Cases

20

discussing the incarcerated parent's provision of support through other people contemplate that the support will come from the incarcerated parent's family or someone who has agreed to assume the incarcerated parent's obligation to care for the child." *In re H.R.M.*, 209 S.W.3d 105, 110 (Tex. 2006) (per curiam); *see also In re S.R.*, 2015 WL 3657747, at \*2. However, an "incarcerated parent cannot meet his burden merely by producing evidence that there is an unincarcerated parent or grandparent who is willing and able to care for the child; instead, the parent must present evidence that the alternative caregiver is providing care on behalf of the parent." *In re J.G.S.*, __ S.W.3d __, __, No. 01-18-00844-CV, 2019 WL 1199521, at \*11 (Tex. App.—Houston [1st Dist.] Mar. 14, 2019, no pet. h.) (citing *In re H.R.M.*, 209 S.W.3d at 110); *see also In re D.Z.R.-M.*, No. 14-13-01084-CV, 2014 WL 1390289, at \*9 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.) (concluding that evidence of aunt's care did not meet father's burden because aunt's care was "on her own behalf, rather than agreeing to assume the Father's obligation to care for the Child while the Father is incarcerated," and alternatively concluding that, even if father met burden, the Department met its subsequent burden). If the parent meets that burden of production, the Department then has the burden of persuasion to show by clear and convincing evidence that the parent's provision or arrangement would not satisfy the parent's duty to the child. *In re Caballero*, 53 S.W.3d at 396.

Here, the Department proved that Father had been incarcerated for two years at the time of trial and that Father would continue to be incarcerated for at least two more years and possibly up to eight more years. However, Father presented testimony that the grandparents were willing to take care of the child; the Department supported the placement of the child with grandparents and Carlisle had "no concerns" with doing so;

21

E.M.'s attorney ad litem recommended placing the child with the grandparents; and Father testified he wanted the child to remain with the grandparents. Grandmother specifically testified that she would be willing to care for E.M. on Father's behalf until he is able to provide support. This shifted the burden to the Department to show that the arrangement would not meet Father's obligation to the child. *See In re H.R.M.*, 209 S.W.3d at 110; *In re J.G.S.*, __ S.W.3d at __, 2019 WL 1199521, at *11. The Department, however, did not present any evidence or argument that the arrangement with the grandparents was inadequate. Therefore, the evidence was legally insufficient to support termination under § 161.001(b)(1)(Q). *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re H.R.M.*, 209 S.W.3d at 110; *In re Caballero*, 53 S.W.3d at 396.

We sustain Father's first issue.[9]

### III. CONCLUSION

We reverse the trial court's judgment terminating Father's parental rights, and we affirm the remainder of the judgment.[10]

Ordinarily, when we find legally insufficient evidence to support a judgment, we render judgment to the contrary. *See* TEX. R. APP. P. 43.3. However, in cases involving involuntary termination of parental rights, "appellate courts are not in a position to

---

[9] Because we find father's first issue dispositive, we need not address his second issue. *See* TEX. R. APP. P. 47.1.

[10] On appeal, Father does not specifically address the trial court's findings in the termination order that (1) appointing him as permanent managing conservator would not be in the child's best interest because such appointment would significantly impair the child's physical health or emotional development, or (2) appointing the Department as the E.M.'s managing conservator would be in the E.M.'s best interest. Therefore, in these circumstances, our reversal of the trial court's termination judgment does not affect the trial court's appointment of the Department as managing conservator. *See In re J.A.J.*, 243 S.W.3d 611, 612–13, 617 (Tex. 2007) (observing that the trial court continuously reviews the propriety of the Department's conservatorship at placement-review hearings, which must occur at least once every six months until the child becomes an adult); *see also In re G.C.*, No. 02-17-00259-CV, 2018 WL 547784, at *27 n.34 (Tex. App.—Fort Worth Jan. 25, 2018, no pet.) (mem. op.) (finding legally insufficient evidence to support trial court's best interest finding and remanding for further proceedings).

determine whether simply to deny the petition for termination or render some other order in the best interest of the child." *Van Heerden v. Van Heerden*, 321 S.W.3d 869, 874–75 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (noting that "circumstances surrounding the parent-child relationship may have changed since the trial court's original judgment, which would require a fact-finder to assess the new situation"). Accordingly, given the circumstances of this case and in the interest of justice, we remand for further proceedings consistent with this opinion. *See* TEX. R. APP. P. 43.3.

DORI CONTRERAS
Chief Justice

Delivered and filed the
26th day of June, 2019.

23