# NO. 12-20-00282-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF E.S.,* | § | *APPEAL FROM THE 3RD* |
| *A CHILD* | § | *JUDICIAL DISTRICT COURT* |
| | § | *HENDERSON COUNTY, TEXAS* |

### MEMORANDUM OPINION

J.S. appeals the termination of his parental rights. In six issues, he argues that the evidence is legally and factually insufficient to support the termination order. Further, the paternal grandparents of the child, T.S. and M.S., argue in two issues that the trial court erred in appointing the Department of Family and Protective Services (the Department) as permanent managing conservator of the child and denying the grandparents any conservatorship status. We affirm.

### BACKGROUND

J.S. is the father and K.B. is the mother of E.S.[1]  T.S. and M.S. are the paternal grandparents of E.S. On August 5, 2019, the Department filed an original petition for protection of E.S., for conservatorship, and for termination of K.B.'s and J.S.'s parental rights.  The Department was appointed temporary managing conservator of the child, the parents were appointed temporary possessory conservators with limited rights and duties, and K.B. was allowed limited access to and possession of the child.

---

[1] At the conclusion of the trial on the merits, the trial court found by clear and convincing evidence that K.B. engaged in one or more of the acts or omissions necessary to support the termination of her parental rights under subsections (D), (E), and (O) of Texas Family Code, Section 161.001(b)(1).  The trial court also found that termination of the parent-child relationship between K.B. and E.S. is in the child's best interest. Based on these findings, the trial court ordered that the parent-child relationship between K.B. and E.S. be terminated. K.B. is not a party to this appeal.

On April 29, 2020, T.S. and M.S. filed their first amended petition in intervention in the suit affecting the parent-child relationship, in which they requested that they be appointed joint managing conservators of the child or, in the alternative, be considered as placement for the child during the time that the Department has temporary conservatorship of the child. The intervenors also requested that the child be placed with them immediately.

At the conclusion of the trial on the merits, the trial court found by clear and convincing evidence that J.S. engaged in one or more of the acts or omissions necessary to support termination of his parental rights under subsections (D), (E), and (O) of Texas Family Code, Section 161.001(b)(1). The trial court also found that termination of the parent-child relationship between J.S. and E.S. is in the child's best interest. Based on these findings, the trial court ordered that the parent-child relationship between J.S. and E.S. be terminated.

The trial court also appointed the Department as permanent managing conservator of E.S. and ordered that the intervenors, T.S. and M.S., not be "awarded any status as a conservator, but shall continue to have visitation at two hours weekly, supervised by the Department, as previously ordered." This appeal followed.

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied*, 53 S.W.3d 684 (Tex. 2001) (per curiam); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2020); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the second subsection of the statute. TEX. FAM. CODE ANN. § 161.001(b)(1); *Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(2); *In re J.M.T.*, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one

2

element does not alleviate the petitioner's burden of proving the other.  TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated.  TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439.  Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  TEX. FAM. CODE ANN. § 101.007 (West 2019).  The burden of proof is upon the party seeking the deprivation of parental rights.  *In re J.M.T.*, 39 S.W.3d at 240.

## STANDARD OF REVIEW

When confronted with both a legal and factual sufficiency challenge, an appellate court first must review the legal sufficiency of the evidence.  *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex. App.–Amarillo 1999, no pet.).  In conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true.  *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).  We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible.  *Id*.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder reasonably could form a firm belief or conviction about the truth of the petitioner's allegations.  *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).  In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id*. at 27–29.  Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266.  The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony.  *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied).

In his first, second, third, and fourth issues, J.S. argues the evidence is legally and factually insufficient to terminate his parental rights pursuant to subsections (D) and (E) of Texas Family Code, Section 161.001(b)(1).[2]

**Applicable Law**

The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent knowingly has placed or knowingly has allowed the child to remain in conditions or surroundings which endanger the physical or emotional well being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(D) (West Supp. 2020). Subsection (D) addresses the child's surroundings and environment. *In re N.R.*, 101 S.W.3d 771, 775–76 (Tex. App.–Texarkana 2003, no pet.). The child's "environment" refers to the suitability of the child's living conditions as well as the conduct of parents or others in the home. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.–Houston [14th Dist.] 2014, pet. denied). The relevant time frame to determine whether there is clear and convincing evidence of endangerment is the time before the child was removed. *Ybarra v. Tex. Dep't of Human Servs.*, 869 S.W.2d 574, 577 (Tex. App.–Corpus Christi 1993, no pet.). Further, subsection (D) permits termination based upon only a single act or omission. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.–San Antonio 1997, pet. denied).

The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct, or knowingly placed the child with

---

[2] We note that J.S. does not challenge every ground upon which the fact finder could have based its decision to terminate his parental rights, specifically subsection (O). We previously have required a parent to challenge all grounds of termination before we addressed any of the grounds. *See In re A.V.*, 113 S.W.3d 355, 361–62 (Tex. 2003); *Fletcher v. Dep't of Family & Protective Servs.*, 277 S.W.3d 58, 64 (Tex. App.–Houston [1st Dist.] 2009, no pet.). However, the Texas Supreme Court held that allowing Section 161.001(b)(1)(D) or (E) findings to go unreviewed on appeal when the parent has presented the issue to the court violates the parent's due process and due course of law rights. *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019). In making its holding, the Court relied on subsection (M), which provides that parental rights may be terminated if clear and convincing evidence supports that the parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)." *Id.* at 234; Tex. Fam. Code Ann. § 161.001(b)(1)(M) (West Supp. 2020). As a result, the "collateral consequences of terminating parental rights under [S]ection 161.001(b)(1)(D) or (E) are significant." *In re N.G.*, 577 S.W.3d at 234. "When a parent has presented the issue on appeal, an appellate court that denies review of a [S]ection 161.001(b)(1)(D) or (E) finding deprives the parent of a meaningful appeal and eliminates the parent's only chance for review of a finding that will be binding as to parental rights to other children." *Id.* at 235. Therefore, due process and due course of law requirements mandate that an appellate court detail its analysis in an appeal of termination of parental rights under Section 161.001(b)(1)(D) or (E) of the Family Code if a parent raises such issues. *Id.* at 237. Accordingly, in light of the Supreme Court's decision in *In re N.G.*, we will consider J.S.'s sufficiency argument as to subsections (D) and (E), even though he does not challenge termination under subsection (O).

persons who engaged in conduct, that endangers the physical or emotional well being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Scienter is not required for an appellant's own acts under Section 161.001(b)(1)(E), although it is required when a parent places his child with others who engage in endangering acts. *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.–Houston [14th Dist.] 2003, pet. denied). Finally, the need for permanence is a paramount consideration for the child's present and future physical and emotional needs. *In re N.K.*, 99 S.W.3d 295, 301 n.9 (Tex. App.–Texarkana 2003, no pet.); *In re M.D.S.*, 1 S.W.3d at 200.

"Endanger" means to expose to loss or injury or to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.–Fort Worth 2001, no pet.). It is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Boyd*, 727 S.W.2d at 533; *In re J.J.*, 911 S.W.2d at 440. When seeking termination under subsection (D), the Department must show that the child's living conditions pose a real threat of injury or harm. *In re N.R.*, 101 S.W.3d at 776; *Ybarra*, 869 S.W.2d at 577. Further, there must be a connection between the conditions and the resulting danger to the child's emotional or physical well being. *Ybarra*, 869 S.W.2d at 577–78. It is sufficient that the parent was aware of the potential for danger to the child in such environment and disregarded that risk. *In re N.R.*, 101 S.W.3d at 776. In other words, conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.–Houston [14th Dist.] 2005, no pet.). We previously have concluded that it is illogical to reason that inappropriate, debauching, unlawful, or unnatural conduct of persons who live in the home of a child, or with whom a child is compelled to associate on a regular basis in his home, is not inherently part of the "conditions and surroundings" of that place or home. *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.–Tyler 1991, writ denied). Subsection (D) is designed to protect a child from precisely such an environment. *Id*.

Subsection (E) requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. *In re D.J.*, 100 S.W.3d 658, 662 (Tex. App.–Dallas 2003, pet. denied); *In re D.M.*, 58 S.W.3d at 811. Termination under subsection (E) must be based on more than a single act or omission. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.–Fort Worth 2000, pet. denied). A voluntary, deliberate, and conscious "course of conduct" by the parent that endangers the child's physical and emotional

well being is required. ***In re D.M.***, 58 S.W.3d at 812; ***In re D.T.***, 34 S.W.3d at 634.

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well being of a child. ***In re M.R.J.M.***, 280 S.W.3d 494, 503 (Tex. App.–Fort Worth 2009, no pet.); ***In re R.W.***, 129 S.W.3d 732, 739 (Tex. App.–Fort Worth 2004, pet. denied). Endangering conduct is not limited to actions directed toward the child. ***Boyd***, 727 S.W.2d at 533. Thus, the endangering conduct may include the parent's actions before the child's birth and while the parent had custody of older children. *See id.* (although endanger means more than threat of metaphysical injury or possible ill effects of less-than-ideal family environment, it is not necessary that parent's conduct be directed at child or that child actually suffers injury); *see als*o ***In re M.N.G.***, 147 S.W.3d 521, 536 (Tex. App.–Fort Worth 2004, pet. denied) (holding that courts may look to parental conduct both before and after child's birth to determine whether termination is appropriate). Further, the conduct may occur after the child has been removed by the Department. ***Walker v. Tex. Dep't of Family & Protective Servs.***, 312 S.W.3d 608, 617 (Tex. App.–Houston [1st Dist.] 2009, pet. denied).

A parent's use of narcotics and its effect on his ability to parent may qualify as an endangering course of conduct. ***In re J.O.A.***, 283 S.W.3d 336, 345 (Tex. 2009); *see also* ***In re R.W.***, 129 S.W.3d at 739. Further, evidence that the parent continued to use illegal drugs, even though the parent knew his parental rights were in jeopardy, is conduct showing a voluntary, deliberate, and conscious course of conduct, which, by its nature, endangers a child's well being. *See* ***In re M.E.-M.N.***, 342 S.W.3d 254, 263 (Tex. App.–Fort Worth 2011, pet. denied); ***Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.***, 221 S.W.3d 244, 253–54 (Tex. App.–Houston [1st Dist.] 2006, no pet.). Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under subsection (E). ***Walker***, 312 S.W.3d at 617–18. A fact finder reasonably may infer from a parent's refusal to take a drug test that the parent was using drugs. ***In re C.A.B.***, 289 S.W.3d 874, 885 (Tex. App.–Houston [14th Dist.] 2009, no pet.); ***In re C.R.***, 263 S.W.3d 368, 374 (Tex. App.–Dallas 2008, no pet.).

Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment. ***In re T.R.L.***, No. 10-14-00290-CV, 2015 WL 1020865, at \*5 (Tex. App.–Waco Mar. 5, 2015, no pet.) (mem. op.); ***In re C.J.O.***, 325 S.W.3d 261, 265 (Tex. App.–Eastland 2010, pet. denied) (holding domestic violence may be considered evidence of

endangerment supporting findings under (D) and (E)). Criminal acts that also constitute domestic violence need not lead to indictment or conviction in order to be considered under the family code. *In re R.S.*, No. 01-18-00058-CV, 2020 WL 3393069, at *8 (Tex. App.–Houston [1st Dist.] June 18, 2020, no pet.) (mem. op.). A court may consider a parent's failure to complete a service plan as part of the endangering conduct analysis. *In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *12 (Tex. App.–Fort Worth July 16, 2015, no pet.) (mem. op.); *In re T.H.*, No. 07-07-00391-CV, 2008 WL 3351948, at *7–8 (Tex. App.–Amarillo Aug. 12, 2008, no pet.) (mem. op.).

**Analysis**

This case began when the Department received a report on July 29, 2019, which alleged concerns about K.B.'s boyfriend and his household and J.S.'s and K.B.'s mental health diagnoses and previous substance abuse. The report also stated that the child looked "bad" when he arrived at T.S.'s and M.S.'s home a few days prior to the date of the report. According to the Department investigator, J.S. and E.S. lived with T.S. and M.S. The investigator said that J.S. denied any Department history but admitted to domestic violence between him and K.B. J.S. also stated that he and K.B. used methamphetamine together and that he last used methamphetamine three weeks prior to her visit.

The investigator stated that K.B. appeared to be under the influence of drugs during their interview. The investigator further noted that K.B. alleged domestic violence occurred between T.S. and J.S., that she and J.S. used methamphetamine together, that he had injected her with methamphetamine, and that J.S. had raped her multiple times. K.B. also alleged that T.S. and M.S. were alcoholics and "pill poppers." According to the investigator, all parties were requested to submit to drug testing and all but K.B. did so. E.S. also tested positive for methamphetamine, but before the results of his drug test were received, the Department removed E.S. from T.S.'s and M.S.'s home because of a previous temporary restraining order against the grandparents. Thereafter, E.S. was placed in foster care.

The Department investigator's final disposition was that there was "reason to believe" the existence of neglectful supervision and physical abuse of E.S. by K.B. and J.S. because both parents engaged in the use of illegal, mind altering substances while acting as E.S.'s primary caretakers. The investigator also found that there was "reason to believe" the existence of

physical abuse of E.S. because he tested positive for methamphetamine. The allegation of physical neglect of E.S. was "ruled out."

*Criminal History.*

J.S. stated that he was arrested four times. These arrests related to allegations of assault, failing to pay a fine, criminal trespass, and assault causing bodily injury. The Department investigator stated that J.S. had two assault charges, the most recent of which was in April 2019.

*Drug Use.*

J.S. stated that he began using methamphetamine when he was approximately twenty-one years old. According to K.B. and J.S., they used methamphetamine while in T.S.'s and M.S.'s home and while E.S. was present. J.S. said that he used methamphetamine and marijuana about one month before trial. He admitted that he would not test negative if the trial court asked him to submit to drug testing on the date of the trial. The Department's conservatorship worker was concerned that no one, including J.S., expressed any concern that E.S. tested positive for methamphetamine.

*Domestic Violence.*

At one point, E.S. lived at T.S.'s and M.S.'s house because K.B. and J.S. were engaged in physical altercations and drug use. According to K.B., J.S. started a lot of fights and had an "anger" issue. She also accused J.S. of raping her when they were living in the trailer house and were "heavily" using drugs. However, she stated that she never contacted law enforcement. J.S. admitted that he and T.S. had some physical altercations, which he blamed on his own "stupidity." He also described incidents in which T.S. was arrested for simple assault against him and other incidents in which he assaulted T.S.

Further, J.S. invoked his Fifth Amendment right to remain silent when asked about the rape. In a civil case, including a termination of parental rights case, a fact finder may draw an adverse inference against a party who pleads the Fifth Amendment. *See **In re Z.C.J.L.**,* Nos. 14-13-00115-CV, 14-13-00147-CV, 2013 WL 3477569, at *10 (Tex. App.–Houston [14th Dist.] July 9, 2013, no pet.) (mem. op.); ***Tex. Cap. Sec., Inc. v. Sandefer***, 58 S.W.3d 760, 779 (Tex. App.–Houston [1st Dist.] 2001, pet. denied); *see also **In re S.A.P.**,* 459 S.W.3d 134, 146 (Tex. App.–El Paso 2015, no pet.) ("This rule has been applied in suits for parental termination").

*Service Plan.*

According to Iantha Coleman, a Department conservatorship worker, J.S.'s family plan

of service requested that he obtain and maintain stable housing and income, assist the Department in finding permanency for E.S., maintain contact with the caseworker, attend substance abuse counseling, complete an assessment through East Texas Council on Alcoholism and Drug Abuse (ETCADA), attend a batterer's intervention program, complete a mental health assessment and a psychological evaluation, attend anger management, participate in individual counseling and parenting classes, attend a parent collaboration group, and submit to random drug testing.

Coleman stated that J.S. completed a psychological evaluation, the ETCADA assessment, assisted the Department in finding permanency for E.S., and completed the care resource form. The psychological evaluation recommended that J.S. remain under the care of a skilled psychiatrist, adhere to all recommended treatment regimens, complete a substance abuse treatment program and all maintenance sobriety regiments, and abstain from using all illicit substances and alcohol.

The record reflects that J.S. did not complete anger management counseling, substance abuse counseling, a batterer's intervention program, parenting classes, or attend a parent collaboration group. According to Coleman, J.S. submitted to drug testing in August 2019, October 2019, November 2019, December 2019, January 2020, February 2020, and March 2020. But he did not submit to drug testing each time that Coleman requested that he do so, particularly in November 2019, and March 2020. Coleman stated that J.S. admitted to using methamphetamine at the beginning of her involvement in the case. According to Coleman, J.S. did not complete his family plan of service and he admitted at trial that he did not do so. Coleman was concerned because J.S. still was using drugs.

Delayne Thorn, J.S.'s more recent conservatorship worker, testified that J.S. had not completed or initiated any services since he began as his conservatorship worker in May 2020. Although J.S. submitted to drug testing in May 2020, with negative results, he refused to submit to drug testing the week before trial. In June 2020, Thorn had a face-to-face meeting with J.S. in which J.S. stated that he was not working on his service plan.

**Conclusion**

Based on our review of the record, including the aforementioned evidence, we conclude that a reasonable fact finder could have formed a firm belief or conviction that J.S. has a criminal history, has used drugs, i.e., methamphetamine and marijuana, for most of his life, continues to

9

use drugs, and allegedly is violent with his family and the mother of his child. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). Moreover, the trial court could also have determined that J.S. did not complete his service plan, refused to submit to drug testing the week before trial, and was not working his required services. *See id.* Therefore, we hold that the evidence, when viewed in the light most favorable to the finding, was sufficiently clear and convincing so that a reasonable trier of fact could have formed a firm belief or conviction that J.S. knowingly placed or knowingly allowed E.S. to remain in conditions or surroundings that endangered the physical or emotional well being of the child and engaged in conduct or knowingly placed E.S. with persons who engaged in conduct that endangered the physical or emotional well being of the child. *See In re J.F.C.*, 96 S.W.3d at 266. Although the record indicates that J.S. completed some of his service plan tasks, such evidence is not so significant that a reasonable trier of fact could not have reconciled it in favor of the aforementioned findings. *See In re C.H.*, 89 S.W.3d at 25.

Therefore, we hold that the evidence is legally and factually sufficient to support termination of J.S.'s parental rights under subsections (D) and (E) of Texas Family Code, Section 161.001(b). Accordingly, we overrule J.S.'s first, second, third, and fourth issues as to subsections (D) and (E) of Texas Family Code, Section 161.001(b). *See* TEX. R. APP. P. 47.1.

## BEST INTEREST OF THE CHILD

In his fifth and sixth issues, J.S. argues the evidence is legally and factually insufficient to support a finding that termination of his parental rights is in the child's best interest. In determining the best interest of the child, we consider a number of factors, including (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

The family code also provides a list of factors that we consider in conjunction with the aforementioned *Holley* factors. *See* TEX. FAM. CODE ANN. § 263.307(b) (West 2019). These

factors include (1) the child's age and physical and mental vulnerabilities, (2) the magnitude, frequency, and circumstances of the harm to the child, (3) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home, (4) whether there is a history of substance abuse by the child's family or others who have access to the child's home, (5) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision, (6) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time, (7) whether the child's family demonstrates adequate parenting skills, and (8) whether an adequate social support system consisting of an extended family and friends is available to the child. *See id.* § 263.307(b)(1), (3), (6), (8), (10), (11), (12), (13).

The evidence need not prove all statutory or *Holley* factors in order to show that termination of parental rights is in a child's best interest. *See Holley*, 544 S.W.2d at 372; *In re J.I.T.P.*, 99 S.W.3d 841, 848 (Tex. App.–Houston [14th Dist.] 2003, no pet.). In other words, the best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors. *In re D.M.*, 58 S.W.3d at 814. Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the child's best interest. *In re M.R.J.M.*, 280 S.W.3d at 507. But the presence of scant evidence relevant to each factor will not support such a finding. *Id.* Evidence supporting termination of parental rights also is probative in determining whether termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28–29.

**Analysis**

We again note that the evidence supports that J.S. continues to abuse drugs, did not complete his service plan, has a criminal history, and was alleged to have a history of domestic violence against his family and the mother of his child. Regarding E.S., Coleman reported that he is doing very well in his foster home and has made improvements in his speech; he is very sociable and bonded to his foster parents. The Court Appointed Special Advocates (CASA) volunteer stated that E.S. is happy and comfortable in his foster home and adores his older foster brother. E.S.'s foster mother stated that he is a "sweetheart" and a morning child.

*Mental Health.*

According to J.S., he has been diagnosed with schizo-affective bipolar disorder. He has

been under the care of the Andrews Behavioral Health Center since 2015. Although he described his childhood as "shitty" in an initial evaluation by the Andrews Center and stated that he was selling methamphetamine at age sixteen, he denied his statements in the evaluation, stating that it was "full of shit" and that he would have said anything when he was using drugs. J.S. admitted that he was under the influence of drugs when he completed the evaluation and that he was "dazed" most days. He also denied stating that he used to physically fight with his father.

According to J.S., he last saw his counselor at the Andrews Center two days before trial. He declined to take all of his prescribed medications because he could not refill them. He also admitted using alcohol a week before trial. J.S. stated that in October 2019, he was "kind of sort of" having hallucinations or mental health problems. He denied telling his counselor in January 2020, about his having violent thoughts toward people who hurt his feelings. J.S.'s counselor at the Andrews Center testified that J.S. had delusions about his limbs getting longer and shorter during the day, that he feels like a woman is trapped in his body, and that people are controlling his movements. Further, records from the Andrews Center show that J.S. was diagnosed with schizoaffective disorder (bipolar type), cannabis use disorder (mild), other nonspecified stimulant use disorder (severe), major depressive disorder (recurrent episodes) (severe), and unspecified anxiety disorder.

*Employment and Housing*.

J.S. testified that he had two jobs in the year this case was pending. His last employer was Sanderson Farms, but his truck broke down two weeks before trial, which caused him to lose that employment. He stated that he was homeless and living in his truck. Coleman stated that J.S. never provided her a pay stub and that he had lived in three or four places during the pendency of the case. She further stated that he never provided her with a home address.

*Visitation.*

Coleman testified that J.S. had visitation with E.S. for two hour periods, twice a week, and thereafter, for one hour each week. But J.S. missed a few visitations with E.S. Coleman stated that during his visitations, J.S. initially would pace the room, talk to E.S. every now and then, and look at his watch or the clock. She said that at almost every visitation, J.S. would ask if someone else could visit with E.S. for the last fifteen minutes of the visitation. She opined that J.S. got tired of the visitations.

According to Coleman, J.S. did not interact with E.S., did not maintain visual contact

with E.S., and did not understand age appropriate behavior with E.S. The CASA volunteer stated that J.S. was fixated on the time he had left in the visitation and requested that his parents come to the remainder of the visitations. J.S. admitted that he may have asked to shorten his visitation time with E.S. once or twice.

*Recommendation.*

Coleman and the attorney ad litem stated that it was in E.S.'s best interest for J.S.'s parental rights be terminated. Thorn believed it was in E.S.'s best interest for J.S.'s parental rights be terminated because he could not provide for E.S.'s needs, including a safe environment, and that he failed to make any lifestyle or behavioral changes. The CASA volunteer stated that it was in E.S.'s best interest for J.S.'s parental rights be terminated because of his inability to provide a stable home.

Although some evidence might weigh against the trial court's findings, this evidence is not so significant that a reasonable fact finder could not have reconciled it in favor of its finding and formed a firm belief or conviction that terminating J.S.'s parental rights is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re J.F.C.*, 96 S.W.3d at 266. Accordingly, we overrule J.S.'s fifth and sixth issues.

### GRANDPARENTS

In two issues, E.S.'s paternal grandparents, T.S. and M.S., argue that the trial court erred by appointing the Department as permanent managing conservator of the child and by denying them any conservatorship status.

**Standard of Review and Applicable Law**

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." TEX. FAM. CODE ANN. § 153.002 (West 2014). If the court terminates the parent-child relationship with respect to both parents, the court shall appoint a suitable, competent adult, the Department, or a licensed child-placing agency as managing conservator of the child. *See* TEX. FAM. CODE ANN. § 161.207 (West Supp. 2020). The trial court is given wide latitude in determining the best interests of a minor child. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). The judgment of the trial court will be reversed only when it appears from the record as a whole that the court has abused its discretion. *Id.*; *see Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex.

1990); **In re J.D.D.**, 242 S.W.3d 916, 919 (Tex. App.–Dallas 2008, pet. denied) (trial court has broad discretion on child support issues); *see also* **In re J.A.J.**, 243 S.W.3d 611, 616 (Tex. 2007) (conservatorship determinations subject to review for abuse of discretion).

A trial court abuses its discretion when it acts in an arbitrary and unreasonable manner or when it acts without reference to any guiding rules or principles. **In re J.D.D**., 242 S.W.3d at 920 (citing **Downer v. Aquamarine Operators, Inc.**, 701 S.W.2d 238, 241–42 (Tex. 1985)). "A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support [its] decision." **Garza v. Garza**, 217 S.W.3d 538, 549 (Tex. App.–San Antonio 2006, no pet.). The conservatorship decision is not subject to the clear and convincing evidence requirement to which terminations of parental rights are subject. **J.A.J.**, 243 S.W.3d at 616. Instead, the quantum of proof needed in the trial court is simply a preponderance of the evidence. **Id.** Also, there is no statutory presumption that a grandparent should be preferred as managing conservator over the Department or other nonparents. **In re A.C.**, 394 S.W.3d 633, 644 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

## Analysis

We review the conservatorship decision of the trial court under the statutory factors in Texas Family Code, Section 263.307(b) and the **Holley** factors noted above. *See* **In re J.A.J.**, 243 S.W.3d at 616; **D.J. v. Tex. Dep't of Fam. & Protective Servs.**, No. 03-19-00448-CV, 2019 WL 5793118, at *2–3 (Tex. App.–Austin Nov. 7, 2019, pet. denied) (mem. op.). The record shows that E.S. was approximately fourteen months old when he was removed by the Department and placed in foster care. For the majority of those fourteen months, E.S. lived with K.B. or with T.S. and M.S. The evidence reflects that T.S. and M.S. loved E.S. and that J.S. and K.B. wanted E.S. to be placed with T.S. and M.S. if his or her parental rights were terminated. However, we are mindful that E.S.'s best interest is paramount.

*Drug Use.*

According to T.S., he had a prescription for Tylenol 3 for arthritis pain. However, during the investigation, T.S. submitted to drug testing in August 2019, and his test was positive for codeine and hydrocodone. T.S. was unable to provide a current list of prescriptions to match the results of his drug test. M.S. was able to provide prescriptions to verify her results of the August 2019 drug test in which she tested positive for hydrocodone.

According to M.S., an alcohol test in January 2019, showed that she tested positive at

almost twice the "cut off" and T.S. tested positive at almost seven times the "cut off." They both tested positive for ethyl glucuronide. M.S. admitted that these results were concerning. And while neither admitted that they had an alcohol problem to their substance abuse counselor, T.S. and M.S. stated that they stopped drinking alcohol around October 2019. T.S. also admitted that he knew J.S. used methamphetamine in his home and was unsupervised around E.S.

*Criminal History.*

T.S. pleaded guilty to driving while intoxicated in March 2014, and was sentenced to thirty days confinement in the Smith County jail. M.S. also was arrested that night for public intoxication. She said that they were celebrating their twenty-fifth wedding anniversary.

*Domestic Violence.*

According to K.B., she reported to M.S. that J.S. raped her. T.S. stated that such an incident did not occur in their house.

*Service Plan.*

After a January 2020 hearing, T.S. and M.S. were ordered to complete a psychological evaluation and counseling. According to T.S., they completed this service plan. He took two psychological evaluations but has not completed any parenting classes. He denied needing alcohol treatment, although he has been seeing a substance abuse counselor. M.S. stated that she participated in individual counseling with a substance abuse counselor. The attorney ad litem did not see any indication from T.S. and M.S. that they were willing to work "services" to provide a safe and suitable home for E.S.

*Department History.*

According to a Department investigator, there were allegations of domestic violence between T.S. and J.S. in April 2019, and concerns that E.S. was in the home at that time. T.S. stated that J.S. came to his house and appeared to be under the influence of drugs, which resulted in a physical altercation between them. At that point, law enforcement was called. The previous investigation determined that K.B. and E.S. were residing with T.S. and M.S. and that T.S. and M.S. did not allow unsupervised contact between K.B. and E.S. These allegations were "ruled out."

E.S. tested positive for methamphetamine at the beginning of this case. Coleman stated that T.S. and M.S. never addressed or expressed concern about this matter.

*Law Enforcement Calls.*

Beth Mohan, the Department's conservatorship program director, testified that there were close to one hundred 911 law enforcement calls made in response to T.S.'s and M.S.'s home, which included disturbances, family disagreements, alcohol use, yelling complaints, loud music, and reports of a missing person. According to T.S., there might have been twelve 911 call responses to his house over the years, not one hundred. According to T.S., those occasions usually involved arguments between him and J.S.

However, during trial, T.S. was questioned regarding sixteen 911 calls to law enforcement that occurred between 2004 and February 2019. He either denied having made these calls, could not recall having made them, or stated that they were mischaracterized. Those calls involved his being intoxicated and not allowing J.S. or M.S. to leave the house, arguments between J.S. and T.S. when they were drunk, numerous calls to determine where M.S. was located, calls and altercations when M.S. was drunk, drinking and fighting between T.S. and M.S., his dragging M.S. out of a house, and a physical altercation between T.S., M.S., and J.S. with a Bible. There also was a 911 call to law enforcement on February 27, 2019, regarding an altercation between T.S. and J.S., during which T.S. was accused of assaulting J.S. As a result, T.S. went to jail for thirty days but denied it occurred. T.S. stated that he has been falsely arrested for assaulting J.S. on two occasions.

M.S. blamed most of the 911 calls on J.S.'s being rebellious, their arguing over J.S. and her trying to protect her son, and marriage problems wherein she called law enforcement to attempt to solve their arguments. She stated that she called 911 either because she wanted to leave her house and could not because J.S. and T.S. were "getting into it," or because she was intoxicated and did not want to go home and J.S. and T.S. were intoxicated as well. M.S. stated that J.S. called 911 "all the time" if she locked the door to the house.

Coleman stated that T.S. and M.S., at the time of trial, still were denying that law enforcement calls were made to their house and the alcohol issues that prompted the calls. Thorn stated that his reluctance to place E.S. with T.S. and M.S. stemmed from their lack of protective capacities in the past and the lack of responsibility or admission to the numerous 911 law enforcement calls made to their home. According to their substance abuse counselor, T.S. and M.S. denied responsibility for the 911 law enforcement calls, instead, blaming it all on J.S. and K.B.

16

The CASA volunteer recommended permanent managing conservatorship to be with the Department, not T.S. and M.S., because of the seventeen-year history of violence due to alcohol abuse and potential overuse of prescription medications. She testified that she reviewed each of the myriad 911 law enforcement calls to T.S.'s and M.S.'s home. She concluded that there was a history of altercations between family and neighbors that was not an appropriate environment for a young child. According to the CASA volunteer, no child should be allowed to be placed under T.S.'s supervision or placed in T.S.'s and M.S.'s custody. The attorney ad litem also was concerned about the "vast" number of 911 law enforcement calls made to T.S.'s and M.S.'s home.

*Home Study.*

Mohan denied the home study due to the criminal history and home environment, the amount of alcohol being used in the home or 911 calls involving alcohol, and T.S.'s being convicted of driving while intoxicated. She described the home environment as "constant chaos." Coleman stated that the home study on T.S.'s and M.S.'s home was denied because of numerous arrests, convictions, and T.S.'s not taking responsibility for the actions causing him to be arrested. She stated that there also were concerns about alcohol abuse, police records, and the positive alcohol tests. According to Coleman, neither T.S. nor M.S. accepted responsibility for their past actions. However, she admitted that T.S. and M.S. have made some lifestyle changes.

## Conclusion

Based on our review of the record, a trier of fact reasonably could have found that T.S. and M.S. had alcohol problems and that they refused to admit to problems with alcohol even though they both were arrested for actions involving their abuse of alcohol. Moreover, the trier of fact reasonably could have found that T.S.'s and M.S.'s alcohol abuse caused or contributed to approximately one hundred 911 law enforcement calls made to their house and that neither T.S. nor M.S. accepted responsibility for their past actions. Accordingly, we conclude the trial court did not abuse its discretion by finding that the appointment of the Department as permanent managing conservator was in the child's best interest. We overrule T.S.'s and M.S.'s first and second issues.

**DISPOSITION**

Having overruled all of J.S.'s issues, we ***affirm*** the trial court's judgment by which it

terminated his parental rights.  Having also overruled T.S.'s and M.S.'s two issues, we ***affirm*** the trial court's judgment by which it appointed the Department as permanent managing conservator of the child.

BRIAN HOYLE
Justice

Opinion delivered June 17, 2021.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JUNE 17, 2021**

**NO. 12-20-00282-CV**

**IN THE INTEREST OF E.S., A CHILD**

Appeal from the 3rd District Court
of Henderson County, Texas (Tr.Ct.No. FAM19-0564-3)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*